## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

NATIONAL FUEL GAS DISTRIBUTION :      Civil Action No. __1:25-cv-00525__ (GTS/MJK)
CORPORATION and THE BUSINESS :
COUNCIL OF NEW YORK STATE, INC., :
        :
        Plaintiffs, :
        :
v. :
        :
RORY M. CHRISTIAN, in his official capacity :
as Commissioner and Chair of the New :
York State Public Service Commission, :
JAMES S. ALESI, in his official capacity as :
Commissioner of the New York State :
Public Service Commission, DAVID J. :
VALESKY, in his official capacity as :
Commissioner of the New York State :
Public Service Commission, JOHN B. :
MAGGIORE, in his official capacity as :
Commissioner of the New York State :
Public Service Commission, UCHENNA S. :
BRIGHT, in her official capacity as :
Commissioner of the New York State :
Public Service Commission, DENISE M. :
SHEEHAN, in her official capacity as :
Commissioner of the New York State :
Public Service Commission, and RADINA :
M. VALOVA, in her official capacity as :
Commissioner of the New York State :
Public Service Commission, :
        :
        Defendants. :

------------------------------------------------------- X

<u>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

Plaintiffs National Fuel Gas Distribution Corporation and The Business Council of New York State, Inc., bring this civil action against Defendants for declaratory and injunctive relief and allege as follows:

**INTRODUCTION**

1.      This lawsuit challenges New York's prohibition on the interstate operation of call centers.  Recent amendments to section 65(13) of New York's Public Service Law will make it illegal for private utility companies to send customer-assistance calls to call centers "outside of New York state," with violations punished by penalties of up to $100,000 per call. The law's purpose is transparent: to compel utilities to fund New York's job-creation efforts by cutting off their access to the national market in call-center services.

2.      Both on its face and in its purpose and effects, that blatantly protectionist measure flouts the "antidiscrimination principle" at "the very core" of the Commerce Clause. *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (cleaned up).  Indeed, section 65(13) fits the "clearest example" of a law that unconstitutionally discriminates against interstate commerce—one that "overtly blocks the flow of interstate commerce at a State's borders." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).  And it does so for a reason that more than a century of Supreme Court precedent makes clear is forbidden. A state may not "require work to be done within its jurisdiction to promote local employment." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 146 (1970).  Section 65(13) is therefore unconstitutional.

## PARTIES

### Plaintiffs

3.     Plaintiff National Fuel Gas Distribution Corporation is a New York entity organized as a gas corporation under New York Transportation Corporation Law § 10.  It provides natural gas utility service to more than 540,000 customers in New York State.  As a gas corporation, National Fuel is subject to Public Service Law § 65.

4.     Plaintiff The Business Council of New York State Inc. is the leading business organization in New York State, representing the interests of more than 3,000 large and small firms throughout the state.  The Business Council serves as an advocate for employers, working for a healthier business climate and economic growth.  Among its members are gas and electric corporations that are subject to Public Service Law § 65.

### Defendants

5.     Defendant Rory M. Christian is the Chair and Chief Executive Officer of the New York State Public Service Commission, as well as a Commissioner.  "[T]he New York Public Service Commission retains exclusive authority to bring enforcement actions for violations of its rules and regulations." *4Connections LLC v. Optical Commc'ns Grp.*, 618 F. Supp. 2d 178, 186 (E.D.N.Y. 2009).  Christian is sued in his official capacity.

6.     Defendant James S. Alesi is a Commissioner of the New York State Public Service Commission.  Alesi is sued in his official capacity.

7.     Defendant David J. Valesky is a Commissioner of the New York State Public Service Commission.  Valesky is sued in his official capacity.

8.     Defendant John B. Maggiore is a Commissioner of the New York State Public Service Commission.  Maggiore is sued in his official capacity.

9.     Defendant Uchenna S. Bright is a Commissioner of the New York State Public Service Commission.  Bright is sued in her official capacity.

10.     Defendant Denise M. Sheehan is a Commissioner of the New York State Public Service Commission.  Sheehan is sued in her official capacity.

11.     Defendant Radina R. Valova is a Commissioner of the New York State Public Service Commission.  Valova is sued in her official capacity.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.  This Court also has subject-matter jurisdiction under 28 U.S.C. § 1343(a)(3) because this case is brought to redress the deprivation under color of State law of a privilege or immunity secured by the Constitution of the United States.  *See Dennis v. Higgins*, 498 U.S. 439, 447–48 (1991) (the Commerce Clause confers an individual "right, privilege, or immunity").

13.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) because defendants maintain offices and conduct their business in the Northern District of New York. "For the purposes of venue, state officers 'reside' in the district where they perform their official duties." *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 237 (quoting *Holmes v. Grant*, No. 03 Civ. 3426, 2006 WL 851753, at *21 (S.D.N.Y. Mar. 31, 2006)).

14.     There is a present case or controversy between the parties.

15.     National Fuel has standing to sue because it is directly subject to Public Service Law § 65(13) and faces the threat of severe financial penalties if it does not alter its long-standing business practices to comply with § 65(13).  "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and

causation requirements." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). National Fuel's injury is redressable by an injunction or declaratory relief against the mandates of § 65(13).

16.     The Business Council has standing to sue on behalf of members that are gas or electric corporations, and are therefore directly subjected to § 65(13) and face the threat of severe financial penalties if they do not alter their existing business practices. An association has standing to sue "on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344 (1977). The Business Council's members have standing for the same reason as National Fuel—they are directly regulated by § 65(13) and forced to choose between costly compliance and severe penalties. It seeks to protect interests germane to its purpose, advocating for its members and for a healthier business and economic climate in New York State. And neither the claim asserted nor the relief requested requires the participation of individual members, as the claim presents a pure question of law and The Business Council can obtain an injunction on behalf of its members. *Id.* ("[N]either the interstate commerce claim nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context.")

17.     The Court has authority to award relief against Defendants under 42 U.S.C. § 1983. The Court also has equity jurisdiction under *Ex Parte Young*, 209 U.S. 123 (1908). *See Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645–46 (2002) (approving of an *Ex Parte Young* suit against regulatory commissioners in their official capacities). Further, the

Court can award injunctive relief under 28 U.S.C. § 1651, and it can award declaratory and other appropriate relief under 28 U.S.C. §§ 2201 and 2202.

FACTUAL ALLEGATIONS

**New York's regulation of utilities' customer-assistance call centers**

18.    In the early 2000s, New York utilities provided comprehensive customer assistance to customers.  No law mandated specific customer-assistance operations, but it is simply good business to provide good customer service, and the Public Service Commission exercised its general oversight authority to ensure that utilities' customer-assistance services were adequate.  Many utilities operated call centers in their New York service territories, but others operated or contracted with call centers in other states.

19.    Despite the absence of a problem, legislators at that time began to propose bills that would regulate utilities' customer-assistance operations in two ways.  First, the bills would dictate the specific topics on which utilities must provide customer assistance.  Second, the bills would forbid moving customer-assistance services out of state.

20.    In 2008, a bill was proposed to do both of those things.  It would have required utilities to provide customer assistance on specific topics "using services located within this state and within their service area."  N.Y. Bill Jacket, 2008 A.B. 606 (attached as Ex. 1 and available on Westlaw).  The bill passed both houses of the New York Legislature.  *Id.*  But the Governor vetoed the bill for several reasons.  *Id.*  First, it was simply bad policy.  *Id.*  And second, as the Governor explained, the bill "appear[ed] to violate the Commerce Clause" because "it discriminat[ed] against out-of-state call center businesses by prohibiting them from providing call center services to the utilities."  *Id.*

21.     After the 2008 bill was vetoed, legislators moderated their approach in 2010. Rather than simply mandate the provision of customer-assistance services in New York, the new version of the customer-assistance law provided: "No gas or electric corporation shall close a call center or other facility providing the customer assistance set forth in paragraph (a) of this subdivision or relocate such customer assistance to another area of New York state or outside of New York state without notice and hearing before the commission." 2010 N.Y. Sess. Laws Ch. 330. That prohibition was codified in § 65(13) of the Public Service Law.

22.     Despite the modest changes, legislators' intentions remained the same. The law's sponsor explained his view that employing out-of-state call centers was "a disinvestment in both New York's economy and overall safety." N.Y. Bill Jacket, 2010 A.B. 7593, ch. 330 (attached as Ex. 2). Letters in support of the bill confirmed its protectionist purpose. One said: "We cannot afford to lose more good jobs." *Id.* Another added: "During this time of economic distress and unrest, saving jobs for New Yorkers should be a priority to us all. . . . Simply stated—call center jobs for New Yorkers will help our economy." *Id.*

23.     The Public Service Commission also recognized that the law would not provide customers any benefit. It explained that "the bill would duplicate many of the services currently provided by local distribution companies without any clear improvement in customer service." *Id.* It then summarized utilities' then-existing customer-assistance practices and concluded: "The Department supports efforts to protect electric and gas customers, but believes this bill provides no additional tangible benefits for customers, while any additional costs associated with implementation of this legislation would likely be reflected in rates paid by customers." *Id.*

24.     On December 21, 2024, New York dramatically expanded § 65(13)'s restrictions on interstate customer-assistance services.  Rather than simply prohibiting the relocation of call centers without Commission approval, the revised version provided: "For purposes of this section, each individual phone call, writing, email, text, chat, or any other communication shall count as an independent instance of customer assistance, and therefore each shall trigger a gas or electric corporation's duties under paragraph (b) of this subdivision." 2024 N.Y. Sess. Laws Ch. 675 § 1.  Those paragraph (b) duties are the obligation to provide notice to the Commission, request approval to transfer any piece of customer assistance, wait at least sixty days for a hearing, present testimony and other evidence, and wait additional time for the Commission's decision, all before utilities can "send such customer assistance outside such gas or electric corporation's New York State service territory or outside of New York state." *Id.*

25.     In effect, by adding a prohibition on transferring individual calls out of state to the existing prohibition on moving call centers, the 2024 amendments achieved the same end the Governor had recognized as unconstitutional in 2008: mandating the provision of customer-assistance services in New York.  The only change is the addition of the burdensome notice-and-hearing process to seek the Commission's permission to engage in interstate commerce.

26.     The 2024 amendments also added tailored penalties of "fifty thousand dollars constituting a civil penalty for each separate and distinct customer service inquiry sent outside of New York and one hundred thousand dollars constituting a civil penalty for each day a call center or other facility providing the customer assistance is closed," though those penalties applied only if they produced a sum greater than the baseline penalties the law

already provided for violations of the Public Service Law. *Id.* § 2. Because the baseline penalty is up to $100,000 per offense, and $100,000 per day in the event of a continuing violation, N.Y. Pub. Serv. Law § 25(2), the customer-assistance-specific penalties appeared to be a null set.

27.    As with the original version of the law, the motivation for the 2024 amendments was clear: they are designed to keep "good-paying jobs here in New York State." N.Y. Bill Jacket, 2024 S.B. 8626-A, ch. 675 (governor approval memorandum) (attached as Ex. 3).

28.    Most recently, New York enacted additional minor amendments to § 65(13) on March 7, 2025. Those amendments eliminated the express statement that each individual call or text was subject to subsection (b)'s notice-and-hearing requirement. 2025 N.Y. Sess. Laws ch. 107 § 1. But they did not actually alter the breadth of § 65(13)(b)'s prohibition. It continues to forbid sending "customer assistance outside such gas or electric corporation's New York state service territory or outside of New York state without notice, a hearing and approval before the commission." *Id.* The 2025 amendments also add a carveout from the restriction on transferring calls outside of utilities' New York service area, allowing the transfer "of customer assistance calls to any of the corporation's call centers *within New York* state in existence prior to the effective date of the chapter of the laws of two thousand twenty-five that amended this paragraph, regardless of the specific service territory." *Id.* (emphasis added). There is no such carveout allowing utilities to continue pre-existing *interstate* commerce in customer-assistance calls. *See id.*

29.    In addition, the 2025 amendments add narrow exceptions allowing utilities to temporarily send customer-assistance requests "outside of New York state" if a natural

disaster, cyber attack, or other emergency makes it impossible to adequately respond to customer-assistance requests. *Id.* And they eliminate the specific penalty provision from the 2024 amendments, returning the prohibition on transferring customer-assistance calls out of state to the Public Service Law's default $100,000-per-offense penalty. *Id.* § 2. Finally, the 2025 amendments set an effective date of June 19, 2025 for the changes made by the 2024 and 2025 amendments. *Id.* §§ 3, 4.

30.    So on June 19, 2025, the version of § 65(13)(b) that will go into effect will provide: "No gas or electric corporation shall close a call center or other facility providing the customer assistance set forth in paragraph (a) of this subdivision or send such customer assistance outside such gas or electric corporation's New York state service territory or outside of New York state without notice, a hearing and approval before the commission." The Commission must wait at least 60 days before holding the hearing, and there is no deadline for the Commission to provide a decision approving or denying a request to relocate customer-assistance inquiries outside of New York. *Id.* That timeline means Plaintiffs cannot obtain a hearing—let alone a decision—before the amendments to § 65(13) take effect. And once the amendments take effect, violations can be punished by civil penalties of up to $100,000 per offense—meaning, as Plaintiffs understand the statute, per call answered outside the state of New York.

31.    The Public Service Commission will enforce § 65(13)'s mandate. N.Y. Pub. Serv. Law § 26; *4Connections LLC*, 618 F. Supp. 2d at 186 (collecting cases).

**The Public Service Commission requires quality customer assistance**

32.     Separately from § 65(13)'s mandate, the Public Service Commission continues to require utilities to maintain high-quality customer service.  National Fuel's obligations are representative.

33.     National Fuel must track and report on certain Customer Service Performance Indicators, including the number of calls customers abandoned, the speed with which customers' calls are answered, and the length of time customers spend on hold.  The Commission also tracks the number of customer complaints it receives about National Fuel and National Fuel customers' responses to customer-satisfaction surveys.

34.     Poor performance on those metrics has consequences.  For example, National Fuel must answer more than 74% of the customer-assistance calls it receives within 30 seconds.  If it fails to do so, it suffers a "negative revenue adjustment"—a financial penalty which reduces its return on equity.  More severe negative revenue adjustments are imposed if National Fuel's rate of answering calls within 30 seconds dips lower.   The same consequences apply if National Fuel does not meet the metrics the Commission set for customer complaints and customer satisfaction.

**Plaintiffs' provision of customer-assistance services**

35.     New York utilities handle their obligation to provide customer assistance in different ways.  Some have opened and operate their own call centers, whether in New York and/or in other states.  Others enter into contracts with third-party operators that provide customer-assistance services.  Those third parties have existing call centers where they will provide those services, which are often located outside of New York state.

36.     National Fuel is an example of the first approach.  It serves customers in both New York and Pennsylvania and operates a call center in each state, each staffed with its own employees.  For New York customers, it operates two different telephone queues: one for gas emergencies like potential leaks and one for ordinary customer-assistance requests.

37.     Almost all employees in Pennsylvania are trained to assist New York customers with emergency calls.  So National Fuel uses a single emergency queue that is answered by the first available customer-assistance representative, whether that representative is in Pennsylvania or New York.  That single queue ensures that customers who need urgent assistance receive help as quickly as possible.  Requiring all emergency calls to be answered in New York, as the amendments to § 65(13) do, would impair National Fuel's responsiveness in those emergency situations.

38.     Apart from the emergency queue, a number of employees in Pennsylvania also handle ordinary customer-assistance calls from New York customers.  Those employees make up approximately 15% of the overall New York queue for ordinary customer-assistance calls.  In order to provide the fastest response within that queue, National Fuel does not differentiate based on the representative's location—representatives receive calls in the same way whether they are in Pennsylvania or New York.

39.     National Fuel is not aware of ever receiving a customer complaint based on the location of the employee who answered a customer-assistance call.

40.     To comply with the amended § 65(13), National Fuel would have to reprogram its phone system.  It would also have to hire additional New York employees, and customer service would be diminished during the lengthy period before National Fuel can hire and train additional representatives in New York.  And unless National Fuel nearly doubles the

number of New York representatives to replace all of the Pennsylvania representatives who are no longer allowed to help New York customers with emergencies, responses to emergency calls would be delayed and customers placed at increased risk.

41.    Those changes would result in a highly inefficient use of labor resources and significantly increase costs for National Fuel (and in turn its ratepayers). They would also make it more difficult for National Fuel to comply with the quality standards for customer assistance that the Commission has imposed, which could subject National Fuel to negative revenue adjustments.

42.    Other utilities, including members of The Business Council, instead take the second approach, contracting with a provider of customer-assistance services rather than operating their own call center.  Those third parties are of course limited by the locations where the provider with which they have contracted operates.  Given the limited existing market for providers of call-center services in New York, companies that work with third-party providers may be unable to comply with § 65(13) without building and opening call centers of their own and resulting in diminished customer service.  That would be an expensive undertaking that likely cannot be completed by June 19, 2025.

43.    In other industries, companies do not operate call centers in every state where they do business to answer calls from residents of those states.  Instead, they typically centralize customer-assistance services to achieve the economies of scale that the national market allows.  So if New York enacted a law requiring, for example, major retailers to operate call centers in New York to address the concerns of any New York residents, it would similarly upend the market for customer-assistance services in those industries.

**The Public Service Commission intends to enforce the in-state customer-assistance mandate**

44.    On April 7, 2025, National Fuel and The Business Council wrote to the Public Service Commission to address § 65(13)'s unconstitutionality.  Ex. 4.  The letter explained that the Commerce Clause forbids laws, like § 65(13), that wield the state's regulatory authority to discriminate against interstate commerce and compel investment in a state.  To avoid the need for litigation, the letter asked the Commission to provide assurances by April 23, 2025 that it would not enforce such a patently unconstitutional law.

45.    The Public Service Commission responded on April 28, 2025.  Ex. 5.  It made clear its intent to enforce § 65(13), stating that "promising not to enforce some or all of the provisions in Public Service Law § 65 (13)" would, "in effect, nullify an act of the New York State Legislature."  *Id.*  In response to Plaintiffs' explanation of § 65(13)'s constitutional defects, the Commission simply claimed that the requirement "is a reasonable means of protecting the public by, among other things, helping to ensure a rapid and efficacious response in the event of an emergency."  *Id.*  It did not attempt to reconcile that claim with its previous statements that mandating in-state and in-service-area call centers "fails to demonstrate additional concrete benefits for customers," N.Y. Bill Jacket, 2010 A.B. 7593, ch. 330, or its conclusion that the nearly identical mandate in the 2008 bill would "diminish the efficient operation of utility service (and place upward pressure on rates) without any clear improvement in customer service."  N.Y. Bill Jacket, 2008 A.B. 606.

### CLAIMS FOR RELIEF

**The Commerce Clause of the U.S. Constitution (42 U.S.C. § 1983)**

46.    All allegations above are incorporated by reference.

47.      Under the Articles of Confederation, states erected trade barriers that were "cutting off the very life-blood of the nation." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 515 (2019) (quoting M. Farrand, The Framing of the Constitution of the United States 7 (1913)).  "Because each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents, what Justice Johnson characterized as a 'conflict of commercial regulations, destructive to the harmony of the States,' ensued." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 571 (1997) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 224 (1824) (Johnson, J., concurring in the judgment)).  The Constitution was, in part, a response to that economic balkanization, "and when the Constitution was sent to the state conventions, fostering free trade among the States was prominently cited as a reason for ratification." *Tennessee Wine*, 588 U.S. at 516 (internal citations omitted).

48.      More than a century of settled Supreme Court precedent has enforced that anti-protectionism principle through the Commerce Clause. *Id.* at 516–18.  That precedent "prohibits a State from using its regulatory power to protect its own citizens from outside competition." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980).  "Thus, where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).

49.      A law can violate the Commerce Clause's prohibition on protectionist state laws in three ways: by discriminating on its face, having a discriminatory purpose, or having a discriminatory effect. *Restaurant Law Ctr. v. City of New York*, 90 F.4th 101, 118 (2d Cir. 2024).  Section 65(13) does all three.

50.     First, on its face, § 65(13) "overtly blocks the flow of interstate commerce at [New York's] borders." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623 (1978).  The law defines whether commerce in customer-assistance services is permissible based on the borders of "New York State."  N.Y. Pub. Serv. Law § 65(13)(b).  If utilities hire customer-service workers or contract with call centers in New York, their conduct is legal.  If they instead seek to transfer calls to employees in a neighboring state or hire an out-of-state company, they face crippling fines of $100,000 per offense or per day.  N.Y. Pub. Serv. Law § 25(2).  That facial discrimination against interstate commerce is subject to "a virtually per se rule of invalidity."  *City of Philadelphia*, 437 U.S. at 624.

51.     Second, § 65(13) has an unconstitutional purpose.  "[T]he Commerce Clause forbids a State to require work to be done within its jurisdiction to promote local employment."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 146 (1970).  But as § 65(13)'s supporters openly admitted, that is why they enacted it—to compel businesses to invest in local industry at the expense of out-of-state competitors.  *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270–71 (1984).  The Commerce Clause does not permit laws designed to favor "in-state business or investment at the expense of out-of-state businesses."  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 260 (2d Cir. 2001); *see also C&A Carbone*, 511 U.S. at 390 ("The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent.").

52.     Third, as is to be expected of a law that is designed to discriminate against interstate commerce and does so expressly, § 65(13) also has the practical effect of

discriminating against interstate commerce. It confers a clear "competitive advantage" on "local business vis-à-vis out-of-state competitors" by prohibiting utilities from using the services of out-of-state employees or call centers without notice, a hearing, and Commission approval. *Restaurant Law Ctr. v. City of New York*, 90 F.4th 101, 120 (2d Cir. 2024) (cleaned up). Like the local ordinance the Supreme Court held unconstitutional in *C&A Carbone, Inc. v. Town of Clarkstown*, § 65(13) discriminates against interstate commerce "by its practical effect and design" because it keeps out-of-state call-center operators out of the market for New York utilities' customer-assistance calls. 511 U.S. 383, 394 (1994). So like that ordinance, § 65(13) is unconstitutional.

53.    For each of those independent reasons, § 65(13) unconstitutionally discriminates against interstate commerce. It is therefore subject to "a virtually per se rule of invalidity." *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (quoting *City of Philadelphia*, 437 U.S. at 624).

54.    To carry its "extremely difficult burden" of surviving that virtually per se rule, Defendants must show that § 65(13) "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Camps Newfound*, 520 U.S. at 581 (quotation omitted). The only justification Defendants have offered—that § 65(13) helps ensure "a rapid and efficacious response in the event of an emergency," Ex. 5—comes nowhere close. There is no conceivable reason that forbidding transferring a call from Buffalo, New York to Erie, Pennsylvania, while allowing the same call to be transferred to Manhattan, does anything to improve emergency response. The Commission itself recognized those points when evaluating the 2008 and 2010 bills. Its unexplained and

unjustifiable change of position indicates what the § 65(13)'s text and background make clear: the claimed safety concerns are a pretext for protectionism.

55.     Because § 65(13) is unconstitutional, Plaintiffs are entitled to prospective injunctive relief and declaratory relief.

**Equitable Relief**

56.     All allegations above are incorporated by reference.

57.     Federal courts have the power to enjoin state officials' unlawful actions.  *See Verizon Md.*, 535 U.S. at 645–46.

58.     To prove entitlement to a permanent injunction, a plaintiff must of course prevail on the merits.  *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011).  From there, the plaintiff "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392 (2006).  The final two factors merge when the government is the defendant.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

59.     Plaintiffs will succeed on their claim that § 65(13) violates the Commerce Clause.

60.     Plaintiffs suffer irreparable harm for two reasons.  First, "[i]n the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm."  *Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232, 243 (N.D.N.Y. 2022) (quoting *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 448 (D. Conn. 2020)); *see also Conn. Dep't of*

*Env'tal Protection v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004) ("we have held that the alleged violation of a constitutional right triggers a finding of irreparable injury" (cleaned up)). Section 65(13)'s violation of Plaintiffs' rights under the Commerce Clause thus constitutes irreparable injury in itself. *See Dennis v. Higgins*, 498 U.S. 439, 447 (1991) (holding that the Commerce Clause's restriction on protectionist state laws confers a constitutional right, privilege, or immunity). Second, complying with § 65(13), or facing sanctions for violating it, will cause Plaintiffs "damage that cannot be rectified by financial compensation," *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991), because sovereign immunity would bar any attempt to seek damages, *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam).

61.     For the same reason, remedies at law cannot compensate Plaintiffs for their constitutional injury.

62.     The balance of hardships and the public interest favor relief here because the "Government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (cleaned up). Vindicating the Constitution is of course in the public interest.

### Declaratory Relief (28 U.S.C. § 2201)

63.     All allegations above are incorporated by reference.

64.     In any "case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

65.     "Claims for declaratory judgment may be brought so long as there is 'a substantial controversy, between parties having adverse legal interests, of sufficient

immediacy and reality to warrant the issuance of a declaratory judgment.'" *Red Fort Capital, Inc. v. Guardhouse Productions, LLC*, 397 F. Supp. 3d 456, 473 (S.D.N.Y. 2019) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

66.    For the reasons explained above, those conditions are satisfied here.   This Court should therefore enter a declaration that § 65(13) is unlawful.

**PRAYER FOR RELIEF**

Plaintiffs request the following relief:

A.      A declaration, order, and judgment that New York Public Service Law § 65(13) violates the Commerce Clause of the U.S. Constitution and cannot be enforced against Plaintiffs or The Business Council's members;

B.      An injunction prohibiting Defendants from enforcing Public Service Law § 65(13) against Plaintiffs or The Business Council's members;

C.      Costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

D.      Any other relief that this Court deems just and proper.

Dated: April 29, 2025

JONES DAY

By: */s/ Anthony J. Dick*

Anthony J. Dick, Bar No, 5078662
Anthony J. Jeffries, *pro hac vice pending*
ajdick@jonesday.com
ajjeffries@jonesday.com
51 Louisiana Avenue, N.W.
Washington, D.C. 20001.2113
Telephone: +1 (202) 879-3939
Facsimile: +1 (202) 626-1700

Tracy V. Schaffer, Bar No. 3959970
Benjamin Chasan, Bar No. 5920962
tschaffer@jonesday.com
bchasan@jonesday.com
250 Vesey Street
New York, NY 10281.1047
Telephone: +1.212.326.3939
Facsimile: +1.212.755.7306

*Attorneys for Plaintiffs*