**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL FUEL GAS DISTRIBUTION CORPORATION and THE BUSINESS COUNCIL OF NEW YORK STATE, INC.,<br><br>Plaintiffs,<br><br>-against-<br><br>RORY M. CHRISTIAN, in his official capacity as Commissioner and Chair of the New York State Public Service Commission, JAMES S. ALESI, in his official capacity as Commissioner of the New York State Public Service Commission, DAVID J. VALESKY, in his official capacity as Commissioner of the New York State Public Service Commission, JOHN B. MAGGIORE, in his official capacity as Commissioner of the New York State Public Service Commission, UCHENNA S. BRIGHT, in her official capacity as Commissioner of the New York State Public Service Commission, DENISE M. SHEEHAN, in her official capacity as Commissioner of the New York State Public Service Commission, RADINA M. VALOVA, in her official capacity as Commissioner of the New York State Public Service Commission,<br><br>Defendants. | Civil Action No. 1:25-cv-00525-GTS-MJK |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


Table of Contents ..... i

Table of Authorities ..... ii

Introduction ..... 1

Background ..... 2

- A. New York begins to restrict utilities' out-of-state provision of customer-assistance services. ..... 2
- B. Amendments expand the restrictiveness of New York's requirements for in-state provision of customer assistance. ..... 4
- C. Plaintiffs rely on the interstate market for customer-assistance services to respond to customer concerns. ..... 6

Legal Standard ..... 7

Argument ..... 8

I. Plaintiffs are likely to succeed on the merits. ..... 8

- A. New York's customer-assistance restriction facially discriminates against interstate commerce. ..... 9
- B. Section 65(13)'s in-state mandate was enacted to discriminate against interstate commerce. ..... 14
- C. Section 65(13) discriminates against interstate commerce in its effects. ..... 16
- D. Section 65(13) cannot survive the Commerce Clause's virtually per se rule of invalidity. ..... 17

II. The remaining preliminary-injunction factors favor relief. ..... 19

Conclusion ..... 22

## TABLE OF AUTHORITIES

PAGE

**CASES**

*A.H. by and through Hester v. French*,
985 F.3d 165 (2d Cir. 2021) .......... 19

*Agudath Israel of America v. Cuomo*,
983 F.3d 620 (2d Cir. 2020) .......... 20

*Arkansas Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n*,
461 U.S. 375 (1983) .......... 11

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984) .......... 14, 19

*Brown & Williamson Tobacco Corp. v. Pataki*,
320 F.3d 200 (2d Cir. 2003) .......... 10

*C&A Carbone, Inc. v. Town of Clarkstown*,
511 U.S. 383 (1994) .......... 8, 13, 16

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
520 U.S. 564 (1997) .......... 14, 17, 19

*Chemical Waste Mgmt., Inc. v. Hunt*
504 U.S. 334 (1992) .......... 14

*City of Philadelphia v. New Jersey*,
437 U.S. 617 (1978) .......... 8, 9, 10, 14

*Connecticut Dep't of Env'tal Protection v. OSHA*,
356 F.3d 226 (2d Cir. 2004) .......... 20

*Dean Milk Co. v. City of Madison*,
340 U.S. 349 (1951) .......... 12

*Dennis v. Higgins*,
498 U.S. 439 (1991) .......... 20

*Donohue v. Paterson*,
715 F. Supp. 2d 306 (N.D.N.Y. 2010) .......... 20, 21

*Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*,
126 F.4th 476 (6th Cir. 2025) .......... 12

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*,
733 F.3d 393 (2d Cir. 2013) .......... 12, 20

*Foster-Fountain Packing Co. v. Haydel*,
278 U.S. 1 (1928) .......... 13, 14

*Fulton Corp. v. Faulkner*,
516 U.S. 325 (1996) .......... 9

*General Motors Corp. v.* Tracy,
519 U.S. 278 (1997) ........................................................ 12

*Granholm v. Heald*,
544 U.S. 460 (2005) ........................................................ 1, 9, 10

*Hughes v. Oklahoma*,
441 U.S. 322 (1979) ........................................................ 9, 10, 14, 17

*Hunt v. Wash. State Apple Advertising Comm'n*,
432 U.S. 333 (1977) ........................................................ 14, 15

*Johnson v. Haydel*,
278 U.S. 16 (1928) ........................................................ 13

*Lewis v. BT Inv. Managers, Inc.*,
447 U.S. 27 (1980) ........................................................ 14, 16

*Maine v. Taylor*,
477 U.S. 131 (1986) ........................................................ 19

*Mitchell v. Cuomo*,
748 F.2d 804 (2d Cir. 1984) ........................................................ 20

*N.Y. Progress & Protection PAC v. Walsh*,
783 F.3d 483 (2d Cir. 2013) ........................................................ 19

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ........................................................ 1, 17

*New Energy Co. of Ind. v. Limbach*,
486 U.S. 269 (1988) ........................................................ 1, 10

*New England Power Co. v. New Hampshire*,
455 U.S. 331 (1982) ........................................................ 12

*NextEra Energy Cap. Holdings, Inc. v. Lake*,
48 F.4th 306 (5th Cir. 2022) ........................................................ 12

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................ 8, 22

*Oregon Waste Sys., Inc. v. Dep't of Env't Quality*,
511 U.S. 93 (1994) ........................................................ 9, 10, 17

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) ........................................................ 13

*Restaurant Law Ctr. v. City of New York*,
90 F.4th 101 (2d Cir. 2024) ........................................................ 8, 16

*Robar v. Village of Potsdam Bd. of Trustees*,
490 F. Supp. 3d 546 (N.D.N.Y. 2020) ........................................................ 20

*Selevan v. N.Y. Thruway Auth.*,
584 F.3d 82 (2d Cir. 2009) ........................................................ 16

*South-Central Timber Dev., Inc. v. Wunnicke*,
467 U.S. 82 (1984) (plurality opinion) .......... 12

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,
588 U.S. 504 (2019) .......... 8, 10

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
261 F.3d 245 (2d Cir. 2001) .......... 11, 12

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007) .......... 8

*United States v. New York*,
708 F.2d 92 (2d Cir. 1983) .......... 21

*Variscite NY One, Inc. v. New York*,
640 F. Supp. 3d 232 (N.D.N.Y. 2022) .......... 16, 20

*Volokh v. James*,
656 F. Supp. 3d 431 (S.D.N.Y. 2023) .......... 20

*Winter v. Natural Resources Defense Council*,
555 U.S. 7 (2008) .......... 8

*Wyoming v. Oklahoma*,
502 U.S. 437 (1992) .......... 10

**STATUTES**

2010 N.Y. Sess. Laws Ch. 330 .......... 3

2024 N.Y. Sess. Laws Ch. 675 § 1 .......... 4, 11

2025 N.Y. Sess. Laws Ch. 107 § 1 .......... 5, 6, 11, 18

2025 N.Y. Sess. Laws Ch. 107 §§ 3, 4 .......... 6

N.Y. Pub. Serv. Law § 5(1)(b) .......... 2

N.Y. Pub. Serv. Law § 25(2) .......... 5, 11, 21

N.Y. Pub. Serv. Law § 65(1) .......... 2

N.Y. Pub. Serv. Law § 65(13) .......... passim

**OTHER AUTHORITIES**

Case 99-M-0851, Consolidated Edison Company of New York, Inc. - Customer
Service Offices, Order (March 27, 2001), *available at*
https://tinyurl.com/OrderMarch2001 .......... 2

N.Y. Bill Jacket, 2008, A.B. 606 .......... 2, 3, 15, 18

N.Y. Bill Jacket, 2010 A.B. 7593, ch. 330 .......... passim

N.Y. Bill Jacket, 2024 S. 8626A, ch. 675 .......... 4, 15

## INTRODUCTION

At "the very core" of the Supreme Court's Commerce Clause jurisprudence is a simple principle: "the Commerce Clause prohibits the enforcement of state laws driven by economic protectionism." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). That principle "is essential to the foundations of the Union." *Granholm v. Heald*, 544 U.S. 460, 472 (2005). Without it, states could return to "the trade rivalries and animosities, the alliances and exclusivity, that the Constitution and, in particular, the Commerce Clause were designed to avoid." *Id.* at 473. The Constitution does not permit that result. "Thus, state statutes that clearly discriminate against interstate commerce are routinely struck down." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 274 (1988).

The New York law at issue in this case violates the Commerce Clause's core anti-protectionism principle. As recently amended, the state law generally prohibits utilities from operating customer-assistance call centers out of state, subjecting them to draconian penalties if they transfer even a single customer call to a call center outside of New York. On its face, that prohibition draws exactly the line that the Commerce Clause forbids. Utilities' provision of customer-assistance services is legal if they build a call center in New York or hire a New York-based company. But the same services are presumptively forbidden if obtained or provided "outside of New York state." N.Y. Pub. Serv. Law § 65(13)(b).

That is a paradigmatic Commerce Clause violation, and it threatens irreparable harm to Plaintiffs by depriving them of their constitutionally protected right to engage in commerce across state lines. Without injunctive relief, they will be forced to choose between ruinous penalties and fundamentally altering their interstate business operations. Because that is not a choice that the Commerce Clause permits New York to impose, Plaintiffs ask that

this Court enter a preliminary injunction against enforcement of the recent amendments to New York Public Service Law § 65(13)(b) before they take effect on June 19, 2025.

## BACKGROUND

### A. New York begins to restrict utilities' out-of-state provision of customer-assistance services.

The New York State Public Service Commission has jurisdiction over gas corporations and electric corporations (colloquially known as utilities) that provide gas and electricity to New Yorkers' homes. N.Y. Pub. Serv. Law § 5(1)(b). It ensures that utilities "furnish and provide such service, instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable." *Id.* § 65(1). In the early 2000s, the Commission used that authority to ensure that utilities provided adequate customer assistance. *See, e.g.*, Case 99-M-0851, Consolidated Edison Company of New York, Inc. – Customer Service Offices, Order (March 27, 2001), *available at* https://tinyurl.com/OrderMarch2001; *see also* N.Y. Bill Jacket 2008, A.B. 606 (Commission letter summarizing its efforts).

At the same time, New York legislators began to express concern that utilities were moving customer-assistance operations out of New York. N.Y. Bill Jacket 2008, A.B. 606. Legislators considered that trend "a disinvestment in … New York's economy." *Id.* So they passed a bill to mandate that utilities provide "call center service assistance" using only "services located within this state," and specifying the topics on which utilities must provide customer assistance. *Id.* The bill had many supporters, who considered the law "an essential step towards protecting and retaining jobs in New York State." *Id.* The Commission, on the other hand, opposed the bill. *Id.* It explained that requiring in-state customer-assistance services "would diminish the efficient operation of utility service (and place upward pressure on rates) without any clear improvement in customer service." *Id.*

The Governor vetoed the 2008 bill. *Id.* He first agreed with the Commission that there was no evidence that local call-center workers would provide better service. *Id.* He then explained that the bill "appear[ed] to violate the Commerce Clause" because it "discriminate[d] against out-of-state call center businesses by prohibiting them from providing call center services to the utilities." *Id.*

The following legislative session, legislators took a less extreme approach. The new bill again required in paragraph (a) that utilities provide "call center customer assistance" on an array of topics. But instead of mandating that all customer-assistance calls be handled in New York, the new bill provided in paragraph (b): "No gas or electric corporation shall close a call center or other facility providing the customer assistance set forth in paragraph (a) of this subdivision or relocate such customer assistance to another area of New York state or outside of New York state without notice and hearing before the commission." 2010 N.Y. Sess. Laws Ch. 330.

The bill continued to be motivated by the view that moving customer-assistance services out of New York was "a disinvestment in … New York's economy" that should be stopped. N.Y. Bill Jacket, 2010 A.B. 7593, ch. 330. Letters in support recognized that goal. One said: "We cannot afford to lose more good jobs." *Id.* Another added: "During this time of economic distress and unrest, saving jobs for New Yorkers should be a priority to us all. . . . Simply stated—call center jobs for New Yorkers will help our economy." *Id.* This time the Commission neither objected to nor supported the bill, concluding that "although the bill fails to demonstrate additional concrete benefits for customers, its goal is well intentioned and it does not unduly add to the Department [of Public Serivce]'s workload." *Id.* The bill was enacted and codified as subdivision 13 of Public Service Law § 65. As the Commission

predicted, the 2010 law—because it was limited to closing or relocating whole call centers—had limited practical effect on utilities' operations.

### B. Amendments expand the restrictiveness of New York's requirements for in-state provision of customer assistance.

In 2024, New York dramatically expanded the scope of its requirements by making "each individual phone call, writing, email, text, chat, or any other communication" an "independent instance of customer assistance" that could not be transferred out of the utility's "New York state service territory or outside of New York state without notice, a hearing, and approval before the Commission." 2024 N.Y. Sess. Laws Ch. 675 § 1. Hearings can take place no sooner than sixty days after the utility provides notice. *Id.* The 2024 amendments also added: "In no event shall a gas or electric corporation's history of sending customer assistance outside the gas or electric corporation's New York state service territory or outside of New York state be used as justification for doing so after" the 2024 amendments took effect. *Id.* Finally, they imposed a penalty of "fifty thousand dollars constituting a civil penalty for each separate and distinct customer service inquiry sent outside of New York," though that penalty would apply only if it exceeded the Public Service Law's baseline penalty of up to $100,000 per offense. *Id.* As with the earlier enactments, the amendments' purpose was transparent: keeping "good-paying jobs here in New York State." N.Y. Bill Jacket, 2024 S. 8626A, ch. 675 (governor approval memorandum).

In effect, the 2024 amendments transformed the 2010 statute into the 2008 bill that had been vetoed because it violated the Commerce Clause—individual requests for customer assistance can no longer be answered out of state, and thus all customer assistance must be provided using services located in New York. The only difference is that the Commission

*might* (or might not), after a lengthy notice-and-hearing process, allow some calls to be transferred out of state.

Most recently, in March of this year, New York enacted yet more amendments to § 65(13). Those amendments eliminated the express statement that each individual call or text could not be transferred out of state without Commission approval, but they did not alter the scope of § 65(13)'s prohibition. 2025 N.Y. Sess. Laws ch. 107 § 1. Section 65(13) continues to forbid sending any "customer assistance outside such gas or electric corporation's New York state service territory or outside of New York state without notice, a hearing and approval before the commission." *Id.* The 2025 amendments also dropped the § 65(13)-specific penalty, *id.* leaving only the baseline penalty of up to $100,000 per offense. N.Y. Pub. Serv. Law § 25(2). And they removed the prohibition on considering utilities' past practice of sending customer assistance out of utilities' service territory or New York.

The 2025 amendments replaced that prohibition with provision allowing the transfer "of customer assistance calls to any of the corporation's call centers *within* New York state in existence prior to the effective date of the chapter of the laws of two thousand twenty-five that amended this paragraph, regardless of the specific service territory." 2025 N.Y. Sess. Laws ch. 107 § 1 (emphasis added). No such exemption applies to calls transferred out of New York. *See id.* Instead, the narrow exception for calls transferred out of state allows utilities to "send customer assistance requests outside of such corporation's New York state service territory or outside of New York state" during a natural disaster or other emergency, with the further limit that "[a]ny transfer of customer assistance requests outside of New York state … shall be temporary and only for the duration of the emergency situation." *Id.*

The new version of § 65(13), as altered by the 2024 and 2025 amendments, will take effect on June 19, 2025. *Id.* §§ 3, 4.

**C. Plaintiffs rely on the interstate market for customer-assistance services to respond to customer concerns.**

Plaintiffs are (or represent) utilities that must comply with § 65(13). Doing so would require them, absent blanket Commission approval to continue their existing operations, to fundamentally restructure their business operations. Some, which handle their own customer-assistance services, would have to change their operations, hire additional New York employees, and reprogram their phone systems to ensure that New York calls regarding the topics § 65(13)(a) requires are routed exclusively to New York call centers. Others, which contract with third-party customer-assistance providers, would likely have to break their contracts and attempt to find New York providers that can handle the extra volume, or change their existing business practices and hire and train new employees.

National Fuel falls into the first category. Declaration of Nathan Barnes in Support of Plaintiffs' Motion for Preliminary Injunction (Barnes Decl.) ¶ 9. It has two call centers, one in New York and the other in Pennsylvania. *Id.* Employees in Pennsylvania are trained and able to help New York customers. *Id.* ¶¶ 13–14. So for customers calling with emergencies like a potential gas leak, National Fuel does not allocate calls based on their origin—the first available representative in Pennsylvania or New York answers, advises the customer on the immediate next steps to ensure his or her safety, and (if necessary) coordinates the necessary response teams to help. *Id.* ¶ 13. Limiting emergency calls to New York representatives would cause longer wait times, which could be dangerous for customers who need help immediately. *Id.* ¶¶ 13, 19.

Pennsylvania representatives also make up about 15% of the employees who answer non-emergency calls from New York customers. *Id.* ¶¶ 14, 20. Requiring that all calls be answered in New York would cause those customers to suffer longer wait times, which could violate the Commission's requirements for the quality of customer service that utilities must provide. *Id.* ¶ 21. And under its current system, National Fuel is aware of no customer complaints based on the location of the representative who provided customer assistance. *Id.* ¶ 16. So there would be no benefit to offset the adverse effect on customer-assistance quality. *Id.* ¶¶ 16, 21, 23.

Corning Natural Gas Corporation, one of The Business Council's members, falls into the second category. Declaration of Charlene M. Faulk in Support of Plaintiffs' Motion for Preliminary Injunction ¶ 2. In addition to its own call center, which is open during business hours, *id.* ¶ 6, Corning contracts with an out-of-state third-party company, Cooperative Response Center, to answer emergency calls from about 4:30 p.m. to 7:00 a.m. each weekday, *id.* ¶ 8–9. CRC also provides support during business hours—any time Corning's employees do not answer a call after the fourth ring, whether because of high call volume, a power outage, or any other issue, the call goes to CRC and one of its representatives answers. *Id.* ¶ 9. Corning has not received any customer complaints about CRC. *Id.* ¶ 10. Yet to comply with § 65(13), Corning would need to break its contract with CRC and hire several additional employees, which would be "prohibitively expensive" compared to the current cost of responding to emergency calls. *Id.* ¶ 14.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must show: 1) a likelihood of success on the merits; 2) a likelihood of irreparable harm in the absence of preliminary relief; 3) that

the balance of hardships favors relief; and 4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). "The first two factors … are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). And the third and fourth factors merge when a government entity is the defendant. *Id.* at 435.

## ARGUMENT

"State and local governments may not use their regulatory power to favor local enterprise by prohibiting patronage of out-of-state competitors or their facilities." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 394 (1994). Section 65(13) does exactly that. So Plaintiffs are likely to succeed on the merits of their argument that § 65(13) is unconstitutional. That is the key issue here, as irreparable harm is presumed to follow from the violation of a constitutional right, and New York has no legitimate interest in enforcing an unconstitutional law.

### I. Plaintiffs are likely to succeed on the merits.

The "'negative' aspect of the Commerce Clause prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019) (cleaned up). "[W]here simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). A law that discriminates against interstate commerce is therefore unconstitutional unless the state has "no other means to advance a legitimate local purpose." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–39 (2007).

A law can discriminate against interstate commerce in three ways: on its face, in its purpose, or in its effects. *Restaurant Law Ctr. v. City of New York*, 90 F.4th 101, 118 (2d Cir.

2024). Laws often discriminate in several ways—after all, a law that expressly discriminates is often intended to do so and has a discriminatory effect.

New York's customer-assistance restriction bats a thousand. On its face, it prohibits call centers based on whether they fall in or outside the State. Its purpose was to shield New York industry and jobs from interstate competition. And its effect places a substantial burden—if not an outright prohibition—on any utility that wants to access the interstate market for customer-assistance services. It therefore faces and fails the Commerce Clause's "virtually per se rule of invalidity." *Granholm*, 544 U.S. at 476 (quoting *City of Philadelphia*, 437 U.S. at 624).

### A. New York's customer-assistance restriction facially discriminates against interstate commerce.

"State laws discriminating against interstate commerce on their face are 'virtually *per se* invalid.'" *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996) (quotation omitted). Section 65(13)'s facial discrimination is apparent. It forbids sending "customer assistance outside such gas or electric corporation's New York state service territory or outside of New York state without notice, a hearing and approval before the commission." N.Y. Pub. Serv. Law § 65(13)(b). New York has thus "closed its borders to" customer-assistance services "from other States." *City of Philadelphia*, 437 U.S. at 619. That is unconstitutional.

Expressly imposing different rules based on whether commerce occurs within the state or crosses state lines is facial discrimination. *See Oregon Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994). *Hughes v. Oklahoma* illustrates the rule. 441 U.S. 322 (1979). There, Oklahoma law provided, with minor exceptions, that "[n]o person may transport or ship minnows for sale outside the state which were seined or procured within the waters of this state." *Id.* at 323. That law "on its face discriminate[d] against interstate commerce." *Id.*

at 336. The facial discrimination was obvious; the only disputed question in *Hughes* was whether an earlier case allowing states to keep wild game in state, *Geer v. Connecticut*, saved the law. *Id.* at 327. (It didn't. *Id.* at 326 (overruling *Geer*).)

Countless cases illustrate the same point: States cannot regulate commerce based on lines drawn at their borders. "[E]xpressly reserv[ing] a segment of the Oklahoma coal market for Oklahoma-mined coal?" *Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992). Unconstitutional. *Id.* Providing different tax treatment to products "made in certain other states?" *New Energy Co.*, 486 U.S. at 274. Unconstitutional. *Id.* Prohibiting importation of waste "collected outside the territorial limits of the State?" *City of Philadelphia*, 437 U.S. at 618. Unconstitutional. *Id.* The list could go on. *See, e.g.*, *Tennessee Wine*, 588 U.S. at 511; *Granholm*, 544 U.S. at 466–67; *Oregon Waste*, 511 U.S. at 99.

Section 65(13) fits within that long line of unconstitutional laws. It is, like the law in *City of Philadelphia*, among "[t]he clearest examples of such legislation"—"a law that overtly blocks the flow of interstate commerce at a State's borders." 437 U.S. at 624. It sets the rules for transferring customer-assistance calls based on whether they are transferred "outside of New York state." N.Y. Pub. Serv. Law § 65(13)(b). And it provides an exemption from its restrictions only for existing call centers "*within* New York state." *Id.* Section 65(13) therefore "cannot be characterized as anything other than protectionist and discriminatory." *Wyoming*, 502 U.S. at 455. By "its very terms it ma[kes] a geographical distinction in favor of in-state businesses by requiring that a commercial activity be conducted within the state." *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 211 (2d Cir. 2003).

The Commission's authority to grant discretionary exemptions that might allow some utilities to engage in interstate call services, after notice and a hearing, makes no difference.

Because companies have a constitutional *right* to engage in interstate commerce, states cannot prohibit them from doing so and then force them to beg for exemptions. Indeed, forcing utilities to go through that process itself imposes a discriminatory burden on interstate commerce. To obtain approval to transfer even a single call out of state, a utility must provide the Commission notice of its desire to do so. N.Y. Pub. Serv. Law § 65(13)(b). The Commission then waits at least sixty days to hold a hearing. *Id.* After that two-month wait, the utility must present "testimony and/or documentary evidence" to justify its desire to engage in interstate commerce. *Id.* There is then no deadline for the Commission to make a decision.[1] And until the Commission decides, § 65(13)'s prohibition on transferring calls out of state applies, subjecting the utility to $100,000 penalties for each call it transfers. N.Y. Pub. Serv. Law § 25(2). All of this amounts to a significant and unconstitutional burden on any utility that wishes to engage in interstate commerce.

Nor does the analysis change because utilities are a heavily regulated industry. The relevant distinction for purposes of the Commerce Clause is "between private and public *ownership*." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 260 (2d Cir. 2001) (emphasis added). Privately owned utilities retain the same right to engage in interstate commerce as other private entities. *See, e.g.*, *Arkansas Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 392 (1983) ("Our constitutional review of state utility regulation in related contexts has not treated it as a special province insulated from our general Commerce Clause jurisprudence."); *New England Power Co. v. New Hampshire*, 455 U.S. 331, 333, 339 (1982); *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393,

[1] The 2024 amendments would have added a 30-day deadline for the Commission to decide, but the 2025 amendments eliminated that provision. *Compare* 2024 N.Y. Sess. Laws Ch. 675 § 1 *with* 2025 N.Y. Sess. Laws ch. 107 § 1.

398, 431 (2d Cir. 2013); *Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 485, 491-92, 496 (6th Cir. 2025) (there is no "public utility or energy exception to the dormant Commerce clause"); *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 318 (5th Cir. 2022) ("This much is certain: Utilities, despite their history as monopolies and the vestiges of that tradition even in deregulated markets, are not 'immune from ordinary Commerce Clause jurisprudence.'" (brackets omitted) (quoting *General Motors Corp. v. Tracy*, 519 U.S. 278, 291 n.8, (1997))).

Section 65(13) also runs afoul of what the Second Circuit has called the Supreme Court's "local processing line of cases," which involve state and local laws that compel investment in local industry by mandating local provision of necessary services. *United Haulers*, 261 F.3d at 260. In *Dean Milk Co. v. City of Madison*, for example, the Supreme Court addressed a local ordinance that required all milk sold in Madison to "have been pasteurized and bottled … within a radius of five miles from the central portion of the City of Madison." 340 U.S. 349, 350 n.1 (1951). By "erecting an economic barrier protecting a major local industry against competition from without the State," that ordinance "plainly discriminate[d] against interstate commerce." *Id.* at 354. So the ordinance was unconstitutional. *Id.*; *see also South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 100 (1984) (plurality opinion) ("Because of the protectionist nature of Alaska's local-processing requirement and the burden on commerce resulting therefrom, we conclude that it falls within the rule of virtual *per se* invalidity of laws that block the flow of interstate commerce at a State's borders." (cleaned up)); *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 10–14 (1928) (a law that mandated processing of Louisiana shrimp in Louisiana was unconstitutional); *Johnson v. Haydel*, 278 U.S. 16, 17 (1928) (same for Louisiana oysters).

Even more on point is *Pike v. Bruce Church, Inc.*, where the challenged order required a company that operated an Arizona cantaloupe ranch to pack and process its cantaloupes in Arizona instead of shipping them across the border to California. 397 U.S. 137, 138 (1970). Application of Arizona's statute "would require that an operation now carried on outside the State must be performed instead within the State." *Id.* at 141. Arizona's interest in enhancing the reputation of its cantaloupe industry did not justify that requirement. *Id.* A long line of precedent "has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere. Even where the State is pursuing a clearly legitimate local interest, this particular burden on commerce has been declared to be virtually per se illegal." *Id.* at 145. Thus, the Court reasoned: "If the Commerce Clause forbids a State to require work to be done within its jurisdiction to promote local employment, then surely it cannot permit a State to require a person to go into a local packing business solely for the sake of enhancing the reputation of other producers within its borders." *Id.* at 146.

So too here. Section 65(13), on its face, "requir[es] business operations to be performed in the home State that could more efficiently be performed elsewhere." *Id.* at 145. It makes no difference that here, the business operation is answering customer-assistance calls rather than processing goods for export, or that the article of commerce subjected to protectionist regulation is calls rather than coal. *See C&A Carbone*, 511 U.S. at 389. The Commerce Clause protects "all the component parts of commercial intercourse among States." *Foster-Fountain Packing*, 278 U.S. at 10. That includes "service industries." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 577 n. 10 (1997); *see also Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 37 (1980) (Florida could not discriminate against out-

of-state companies that sought to provide banking services to Florida residents). New York cannot require local processing of customer-assistance calls any more than Madison could require local processing of milk or Arizona local processing of cantaloupes.

In short, § 65(13) facially discriminates against interstate commerce. "Such facial discrimination by itself may be a fatal defect, regardless of the State's purpose, because 'the evil of protectionism can reside in legislative means as well as legislative ends.'" *Hughes*, 441 U.S. at 337 (quoting *City of Philadelphia*, 437 U.S. at 626). "At a minimum such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Id.* Section 65(13) is not the rare law that survives that rule. *See infra* Part I.D.

### B. Section 65(13)'s in-state mandate was enacted to discriminate against interstate commerce.

State laws also violate the Commerce Clause if they were "enacted for protectionist purposes." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 272 (1984). Often, as here, that discriminatory purpose is clear from the legislative history or the background to the law's passage. *Id.* at 270–271 (the legislature's stated intent "was to aid Hawaiian industry"); *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 352 (1977) (a law requiring uniform apple grading was pressed by in-state apple producers to eliminate Washington apples' market advantage). The Supreme Court has "consistently found parochial legislation" that aimed "to create jobs by keeping industry within the state" unconstitutional. *Chemical Waste Mgmt., Inc. v. Hunt* 504 U.S. 334, 341 (1992) (cleaned up). Every aspect of § 65(13)'s background makes clear its improper protectionist purpose.

From the beginning, sponsors have said that § 65(13) was enacted to prevent the "disinvestment in … New York's economy" that they believed moving call-center jobs out of

state represented. N.Y. Bill Jacket 2008, A.B. 606; N.Y. Bill Jacket, 2010 A.B. 7593, ch. 330. The 2024 amendments are more of the same. As one senator explained: "You know, at the end of the day it's about jobs." Compl. Ex. 3, Legislative History Page 5441. The Governor agreed, signing the 2024 amendments "to ensure that good-paying union jobs stay right here in New York." N.Y. Bill Jacket 2024, S8626A, ch. 675.

Section 65(13)'s supporters sang from the same hymnal. At every stage, local unions made clear that they supported prohibiting transfers of calls and call centers out of state because it would compel utilities to keep jobs in New York. In 2008: "This legislation is an essential step towards protecting and retaining jobs in New York State." N.Y. Bill Jacket 2008, A.B. 606. And in 2010: "Simply stated—call center jobs for New Yorkers will help our economy." N.Y. Bill Jacket, 2010 A.B. 7593, ch. 330. The bill jacket from 2024 does not contain letters from the unions, but the governor's focus on "union jobs" makes clear the law's backers. Like the North Carolina apple producers in *Hunt*, the unions pushed for § 65(13) to fend off out-of-state competition for customer-assistance jobs. 432 U.S. at 352.

The other claimed purpose for § 65(13)—ensuring quality of customer-assistance services—is pretext, as the Commission itself explained in both 2008 and 2010. Mandating in-state customer assistance "would diminish the efficient operation of utility service (and place upward pressure on rates) without any clear improvement in customer service." N.Y. Bill Jacket 2008, A.B. 606. It "provides no additional tangible benefits for customers." N.Y. Bill Jacket, 2010 A.B. 7593, ch. 330.

Thus, stripped of claims about quality of customer service, § 65(13) is supported only by the naked desire to create New York jobs by forbidding utilities to look anywhere else for employees. Valuable as local jobs are, the Constitution does not allow states to keep them

by cutting off companies' access to the interstate market. *See Lewis*, 477 U.S. at 44 ("[T]he Commerce Clause prohibits a State from using its regulatory power to protect its own citizens from outside competition.").

**C. Section 65(13) discriminates against interstate commerce in its effects.**

Section 65(13) also has a discriminatory effect because it "confers a competitive advantage upon local business vis-à-vis out-of-state competitors." *Restaurant Law Ctr.*, 90 F.4th at 120 (cleaned up). It does so in the most straightforward way possible: it effectively forbids utilities to do business with the "out-of-state competitors" of "in-state commercial interest[s]" unless they get the Commission's permission. *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009).

In that way, § 65(13) is similar to the local ordinance that the Supreme Court held unconstitutional in *C&A Carbone*. There, Clarkstown had passed an ordinance giving a single local firm a monopoly on all waste disposal in the town. *Id.* at 387. Because that ordinance allowed "only the favored operator to process waste" from the town, it discriminated against the interstate market for waste-disposal services. *Id.* at 390–91. "Discrimination against interstate commerce in favor of local business or investment is *per se* invalid," so the ordinance was unconstitutional. *Id.* at 392; *see also Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232, 240–41 (N.D.N.Y. 2022) (enjoining a New York cannabis law that required license applicants to demonstrate "a significant presence in New York state" because it would have "a discriminatory effect on out-of-state residents seeking" a license to sell cannabis).

The advantage § 65(13) provides in-state commercial interests is clear—until the Commission says otherwise, local call-center employees and customer-service providers

have a monopoly in the market for utility customer-assistance services. The Commerce Clause does not permit such "simple economic protectionism." *Nat'l Pork Producers*, 598 U.S. at 372.

**D. Section 65(13) cannot survive the Commerce Clause's virtually per se rule of invalidity.**

For each of those reasons—its facial discrimination, its discriminatory purpose, and its discriminatory effects—§ 65(13) is subject to "the strictest scrutiny." *Camps Newfound*, 520 U.S. at 581 (quoting *Hughes*, 441 U.S. at 337). To carry that "extremely difficult burden," Defendants must show that § 65(13) "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* at 581–82 (quotation omitted).

They don't come close. The only justification they offer is the claim that § 65(13)'s prohibition on sending calls out of state "is a reasonable means of protecting the public by, among other things, helping to ensure a rapid and efficacious response in the event of an emergency." Compl. Ex. 5. But nothing in the legislative history of any iteration of § 65(13) identifies any problem with utilities' emergency responses. And given the Commission's thorough oversight of utilities and strict customer-assistance-quality requirements, it would be quite surprising if Defendants had been allowing a crisis in emergency-response quality to occur on their watch. They haven't. Section 65(13) "solves" a nonexistent problem. The Commission recognized as much in 2008 and 2010, explaining that mandating in-state call centers will "diminish the efficient operation of utility service (and place upward pressure on rates) without any clear improvement in customer service," N.Y. Bill Jacket, 2008 A.B. 606, and "fails to demonstrate additional concrete benefits for customers," N.Y. Bill Jacket, 2010 A.B. 7593. It has not explained its dramatic about face on the issue.

What's more, Defendants' justification just makes no sense. There is no conceivable reason that it would improve emergency responses to forbid sending a call from Buffalo to Erie, but allow the same call to be transferred to Poughkeepsie.[2] Or to allow a call to be transferred from Yonkers to Syracuse, but not to Hoboken. The notion borders on ludicrous. All the more so because one of the only times § 65(13) allows utilities to send customer-assistance calls to another state is *during emergencies*, so customers will not even reap the supposed benefits of local call centers during the one time the Commission is willing to claim it matters.

On top of all that, the Legislature's chosen solution to its nonexistent problem actually undermines emergency responsiveness. As the Barnes Declaration explains, prohibiting the use of National Fuel's Pennsylvania call center to answer emergency calls will reduce the number of available representatives by more than 40% and "could seriously delay answers to customers' emergency calls." Barnes Decl. ¶ 19.

Those points add up to a straightforward conclusion: Defendants' claim that § 65(13) protects the public is pretext for its rank protectionism.

Finally, even taking at face value the claim that keeping customer-assistance calls in New York somehow protects the public, Defendants must show that the same interest "cannot be adequately served by reasonable nondiscriminatory alternatives." *Camps Newfound*, 520 U.S. at 581 (quotation omitted). Only a single Supreme Court case has ever found that a state made that showing. *Maine v. Taylor*, 477 U.S. 131, 151–52 (1986). There, Maine presented testimony from three "scientific experts" who testified that importing out-

---

[2] Although § 65(13)(b) purports to prohibit transferring calls outside of a utility's service area, the 2025 amendments effectively negate that rule by allowing any existing practices of doing so to continue. 2025 N.Y. Sess. Laws ch. 107 § 1.

of-state baitfish threatened to wreak havoc on Maine's ecosystem, and inspecting out-of-state baitfish for parasites or non-native species was "a physical impossibility." *Id.* at 140–41. *That* is what it takes to survive the Commerce Clause's "virtually per se rule of invalidity." *Id.* at 148 (quotation omitted).

Ensuring adequate emergency responsiveness is nothing like the physical impossibility of keeping baitfish parasites out of Maine. Defendants have many regulatory options available to ensure adequate emergency responsiveness. That they jumped straight to banning interstate commerce is telling.

* * *

Section 65(13) brazenly violates the Commerce Clause's most basic prohibition: states may not engage in "simple economic protectionism." *Bacchus*, 468 U.S. at 270. Thus, Plaintiffs are likely to succeed on the merits of their constitutional challenge.

## II. The remaining preliminary-injunction factors favor relief.

The remaining preliminary-injunction factors follow from Plaintiffs' likelihood of success. In constitutional cases, likelihood of success is typically "the dominant, if not the dispositive, factor" in the preliminary-injunction standard. *A.H. by and through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (quoting *N.Y. Progress & Protection PAC v. Walsh*, 783 F.3d 483, 488 (2d Cir. 2013)). That is because "it is well-settled that an alleged constitutional violation constitutes irreparable harm." *Variscite*, 640 F. Supp. 3d at 243 (quotation omitted); *Donohue v. Paterson*, 715 F. Supp. 2d 306, 314–15 (N.D.N.Y. 2010) (collecting cases). So a finding of likelihood of success on a constitutional claim necessarily satisfies the irreparable-harm requirement. *Connecticut Dep't of Env't Prot. v. OSHA*, 356 F.3d

226, 231 (2d Cir. 2004) ("we have held that the alleged violation of a constitutional right triggers a finding of irreparable injury" (cleaned up)).[3]

As for the balance-of-hardship and public-interest factors, which merge when the defendant is a government entity, no government has "an interest in the enforcement of an unconstitutional law." *Robar v. Vill. of Potsdam Bd. of Trustees*, 490 F. Supp. 3d 546, 574 (N.D.N.Y. 2020) (quoting *N.Y. Progress & Protection PAC*, 733 F.3d at 489); *see also Mitchell v. Cuomo*, 748 F.2d 804, 807–08 (2d Cir. 1984). And "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020); *see also Volokh v. James*, 656 F. Supp. 3d 431, 447 (S.D.N.Y. 2023) ("Given that enjoining enforcement of a statute that potentially violates citizens' constitutional rights is in the public interest, and that Defendant can show no harm as a result of being prevented from enforcing an unconstitutional statute, the Court finds that the balance of the equities tips in favor of granting the preliminary injunction." (cleaned up)). Plaintiffs' likelihood of success on the merits of their constitutional claim therefore also requires finding that the equities favor injunctive relief.

Even without those well-settled rules for constitutional cases, Plaintiffs satisfy the preliminary-injunction standard. Defendants have made clear their intent to enforce the amendments to § 65(13), saying that declining to do so would, "in effect, nullify an act of the" Legislature. Compl. Ex. 5. Plaintiffs will therefore suffer irreparable harm if the amendments

[3] The Supreme Court "has often described the Commerce Clause as conferring a 'right' to engage in interstate trade free from restrictive state regulation" and has held that it "amounts to a 'right, privilege, or immunity' under the ordinary meaning of those terms." *Dennis v. Higgins*, 498 U.S. 439, 447–48 (1991).

take effect, either incurring draconian penalties—up to $100,000 per call transferred out of state, N.Y. Pub. Serv. Law § 25(2)—or being forced to upend their existing business practices and incur substantial costs to comply. "[W]here a federal remedy to recover pecuniary losses is barred under the Eleventh Amendment, irreparable harm is present." *Donohue*, 715 F. Supp. 2d at 316; *see also United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam) (for irreparable harm analysis, "in deciding whether a federal plaintiff has an available remedy at law that would make injunctive relief unavailable, federal courts may consider only the available *federal* legal remedies").

Here, the costs for Plaintiffs to move all of their customer-assistance operations to New York would be significant. Barnes Decl. ¶¶ 17–26; Faulk Decl. ¶¶12–16. As explained above, utilities like National Fuel would need to reprogram their phone systems to route covered calls from New York to its New York call centers, then hire and train new employees in New York who may no longer be needed if the Court ultimately rules in Plaintiffs' favor. Barnes Decl. ¶¶ 19–24. Utilities that currently rely on third-party call-center operators may need change their approach entirely and hire significant additional staff. Faulk Decl. ¶¶ 13–15. Either way, the utilities would face substantial and unrecoverable costs to comply with § 65(13)'s unconstitutional mandate. And the harm would not be limited to those immediate costs. Utilities' quality of customer-assistance would also be adversely affected, which would harm their customers and could subject utilities to penalties for failing to comply with the Commission's customer-assistance-quality requirements. Barnes Decl. ¶¶ 18–23.

The balance of the equities and the public interest, which merge when the government is a defendant, likewise favor relief. *Nken*, 556 U.S. at 435. The harm to Plaintiffs from having to comply with the revised version of § 65(13)(b) will be substantial. And on

the other side of the scales, upending the status quo by forcing Plaintiffs to alter their longstanding provision of customer-assistance services during the pendency of this litigation is not in Defendants' or the public's interest. To the contrary, the Commission ensures that utilities provide quality customer service under existing law. Barnes Decl. ¶¶ 3–7. So allowing the law to take effect would only *harm* the public interest by undermining the quality and responsiveness of customer service that utilities can provide. Barnes Decl. ¶¶ 18–24; Faulk Decl. ¶ 15. By cutting off the substantial call-center operations that they operate or rely on across state lines, it would reduce the number of experienced staff members available to take customer calls and increase wait times, with no offsetting benefits in customer service. In emergency situations like a gas leak, where every second counts, that reduction in quality would be dangerous.

## CONCLUSION

New York Public Service Law § 65(13)(b) violates the Commerce Clause, and allowing the 2024 and 2025 amendments to § 65(13) to take effect would irreparably injure Plaintiffs without providing the public any benefit. The amendments should be enjoined.

Dated: May 1, 2025

JONES DAY

By: *\/s/ Anthony J. Dick*

Anthony J. Dick, Bar No. 5078662
Anthony J. Jeffries, *pro hac vice pending*
ajdick @jonesday.com
ajjeffries@jonesday.com
51 Louisiana Avenue, N.W.
Washington, DC 20001.2113
Telephone: +1.202.879.3939
Fascimile: +1.202.626.1700

Tracy V. Schaffer, Bar No. 3959970
Benjamin Chasan, Bar No. 5920962
tschaffer@jonesday.com
bchasan@jonesday.com
250 Vesey Street
New York, NY 10281.1047
Telephone: +1.212.326.3939
Fascimile: +1.212.755.7306

Attorneys for Plaintiffs