UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NAT'L FUEL GAS DISTRIB. CORP.; and THE BUS. COUNCIL OF N.Y. STATE, INC.;

Plaintiffs,

v. 1:25-CV-0525 (GTS/MJK)

RORY M. CHRISTIAN, in his official capacity as Comm'r and Chair of the N.Y. State Pub. Serv. Comm'n; JAMES S. ALESI, in his official capacity as Comm'r of the N.Y. State Pub. Serv. Comm'n; DAVIVD J. VALESKY, in his official capacity as Comm'r of the N.Y. State Pub. Serv. Comm'n; JOHN B. MAGGIORE, in his official capacity as Comm'r of the N.Y. State Pub. Serv. Comm'n; UCHENNA S. BRIGHT, in her official capacity as Comm'r of the N.Y. State Pub. Serv. Comm'n; DENISE M. SHEEHAN, in her official capacity as Comm'r of the N.Y. State Pub. Serv. Comm'n; and RADINA M. VALOVA, in her official capacity as Comm'r of the N.Y. State Pub. Serv. Comm'n,

Defendants.

---

| APPEARANCES: | OF COUNSEL: |
|---|---|
| JONES DAY<br>Counsel for Plaintiffs<br>51 Louisiana Avenue, NW<br>Washington, DC 20001 | ANTHONY J. DICK, ESQ.<br>ANTHONY JACOB JEFFRIES, ESQ. |
| 250 Vesey Street<br>New York, NY 10281-1047 | BENJAMIN CHASAN, ESQ.<br>TRACY SCHAFFER, ESQ. |
| HON. LETITIA A. JAMES<br>Attorney General for the State of New York<br>Counsel for Defendants<br>300 South State Street, Suite 300<br>Syracuse, NY 13202 | TIMOTHY P. MULVEY, ESQ.<br>Assistant Attorney General |
| Dulles State Office Building<br>317 Washington Street, Suite Tenth Floor<br>Watertown, NY 13601 | JULIA K. TOCE, ESQ.<br>Assistant Attorney General |

GLENN T. SUDDABY, United States District Judge

**DECISION and ORDER**

Currently before the Court, in this civil action filed by the above-captioned gas corporation and business-advocacy organization ("Plaintiffs") against the above-captioned chair and six commissioners of the New York State Public Service Commission ("Defendants" or "the Commission"), is Plaintiffs' motion for an Order preliminarily enjoining Defendants, pursuant to Fed. R. Civ. P. 65, from enforcing, against Plaintiffs or the members of The Business Council of New York State, Inc., recent amendments to N.Y. Pub. Serv. Law § 65(13) that are scheduled to take effect on June 19, 2025. (Dkt. No. 7.) Defendants have opposed Plaintiffs' motion; Plaintiffs have replied to that opposition; and a hearing on Plaintiffs' motion has been held. (Dkt. No. 7; Dkt. No. 24; Dkt. No. 25; Minute Entry filed May 29, 2025.) For the reasons set forth below, Plaintiffs' motion for a preliminary injunction is granted.

## I. RELEVANT BACKGROUND

### A. Summary of Plaintiffs' Complaint

Generally, liberally construed, Plaintiffs' Complaint alleges that New York State's enactment of amendments to N.Y. Pub. Serv. Law § 65(13), which prohibit utilities from operating customer-assistance call centers "outside of New York state," violates Article I, Section 8, Clause 3 (i.e., the Commerce Clause) of the U.S. Constitution, by using New York State's regulatory power to protect its own citizens from outside competition, without a legitimate local purpose which cannot be adequately served by reasonable nondiscriminatory alternatives. (*See generally* Dkt. No. 1 [Plfs.' Compl.].) Familiarity with this claim, and the factual allegations supporting it, is assumed in this Decision and Order, which is intended

primarily for review by the parties. (*Id*.)

**B. Summary of Parties' Arguments on Plaintiffs' Motion**

**1. Plaintiffs' Memorandum of Law-in Chief**

Generally, in support of their motion for preliminary injunction, Plaintiffs assert the following three arguments. (*See generally* Dkt. No. 7, Attach. 2 [Plfs.' Memo. of Law].)

First, Plaintiffs argue, they are likely to succeed on the merits of their claim for the following reasons: (a) New York State's customer-assistance restriction discriminates *on its face* against interstate commerce by expressly forbidding gas or electric corporations from "send[ing] . . . customer assistance [calls] . . . outside of New York state" (making a geographical distinction in favor of in-state businesses), and it makes no difference that Defendants have the authority to grant discretionary exemptions that might allow some utilities to engage in interstate call services after notice and a hearing, because Plaintiffs have a constitutional right to engage in interstate commerce; (b) in any event, New York State's customer-assistance restriction discriminates *in its purpose* against interstate commerce, because its legislative history makes clear that it was proposed and enacted to prevent the "disinvestment in . . . New York's economy" and "to ensure that good-paying union jobs stay right here in New York," and its claimed purpose of ensuring quality customer-assistance services is clearly pretextual given Defendants' acknowledgment in 2008 and 2010 that mandating in-state customer assistance "would diminish the efficient operation of utility service (and place upward pressure on rates) without any clear improvement in customer service"; (c) in any event, New York State's customer-assistance restriction discriminates *in its effects* against interstate commerce, because it confers a competitive advantage upon local business as compared to out-of-state competitors by effectively forbidding utilities from doing business with out-of-state competitors unless those

utilities get Defendants' permission; and (d) New York State's customer-assistance restriction fails the resulting strict scrutiny to which it must be subjected, because the restriction's legislative history (and one's common sense) undermines any argument that a problem exists with utilities' rapid and efficacious responses to emergencies which would be corrected by the restriction, and in any event, Defendants cannot show that such a problem cannot be adequately solved by a reasonable nondiscriminatory alternative. (*Id*. at 13-24 [attaching pages "8" through "19" of Plfs.' Memo. of Law].)

Second, Plaintiffs argue, they are likely to experience irreparable harm if the preliminary injunction is not issued for the following reasons: (a) a likelihood of success on a constitutional claim necessarily constitutes a likelihood of irreparable harm (given the well-settled rule that an alleged constitutional violation constitutes irreparable harm); and (b) in any event, in order to avoid the Draconian penalties (up to $100,000 per call transferred out of state) that would be imposed on them by Defendants (who have made clear their intent to enforce the amendments to § 65[13]), Plaintiffs must upend their existing business practices (e.g., by reprogramming their phone systems to route covered calls from New York State to call centers in New York State, then hiring and training new employees in New York State who may no longer be needed if Plaintiffs were to ultimately prevail in this action). (*Id*. at 24-26 [attaching pages "19" through "21" of Plfs.' Memo. of Law].)

Third, Plaintiffs argue, both the "balance of equities" factor and "public interest" factor – which are merged where, as here, the suit is against the Government – favor the issuance of a preliminary injunction for the following reasons: (a) a likelihood of success on a constitutional claim against the Government necessarily also constitutes a likelihood that a balance of equities will tip in Plaintiffs' favor (given the well-settled rule that no government has an interest in the

enforcement of an unconstitutional law); (b) similarly, a likelihood of success on a constitutional claim against the Government necessarily also mandates a finding that the public interest would not be disserved by the relief requested (given the well-settled rule that no public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal); (c) in any event, the substantial harm to Plaintiffs from having to comply with the revised version of § 65(13)(b) (as described above) will far outweigh Defendants' interest in upending the *status quo* by forcing Plaintiffs to alter their longstanding provision of customer-assistance services during the pendency of this litigation (which would actually risk diminishing the quality of those customer-assistance services during that time); and (d) in any event, the public has an interest in receiving quality customer-assistance services, and forcing Plaintiffs to cut off the substantial call-center operations that they operate or rely on across state lines would reduce the number of experienced staff members available to take customer calls and increase wait times (with no offsetting benefits in customer service), thereby endangering customers in emergency situations like a gas leak, where every second counts. (*Id*. at 25-27 [attaching pages "20" through "22" of Plfs.' Memo. of Law].)

**2. Defendants' Opposition Memorandum of Law**

Generally, in Defendants' response to Plaintiffs' motion, they assert the following four arguments. (*See generally* Dkt. No. 24, Attach. 1 [Defs.' Opp'n Memo. of Law].)

First, Defendants argue, Plaintiffs cannot establish a likelihood of irreparable injury for the following reasons: (a) their alleged constitutional injuries are unlikely to enjoy any measure of success on the merits; and (b) Plaintiffs cannot demonstrate that they inevitably will suffer a "total loss," or at least one that cannot otherwise be compensated by monetary remedy, especially given the sworn statement of Defendants' designated representative (Richard Berkley)

that Defendants are not planning to interpret N.Y. Pub. Serv. Law § 65(13) as calling for Plaintiffs to obtain prior approval from Defendants before continuing to transfer calls out of state. (*Id*. at 10-11.)[1]

Second, Defendants argue, Plaintiffs cannot establish a likelihood of success on the merits for the following reasons: (a) under the lesser version of Commerce Clause scrutiny that applies to utility companies that are heavily regulated by the State, the law is constitutional because, rather than close New York State's borders to customer-assistance services from other States (as Plaintiffs argue), the law merely furnishes public utilities with a notice-and-approval process for sending such customer assistance outside of the State (which process has been operating without challenge for the past 15 years), and (as stated by Mr. Berkey) all utilities will be entitled to seek approval for new out-of-service-area call centers or for the out-of-state transfer of customer-assistance inquiries so long as they provide a "reasonable justification" for such transfer; and (b) N.Y. Pub. Serv. Law § 65(13) protects reasonable state interests (specifically, improved customer service by employees located within customers' communities, due to those employees' knowledge of those communities' unique geographical and other attributes, resulting in fewer consumer complaints to Defendants, the cost-savings of which is passed through to consumers in the form of lower utility rates), while imposing only a minimal and hypothetical financial burden on Plaintiffs, who may seek blanket approvals instead of individual ones (and who would no doubt pass any costs through to consumers). (*Id*. at 11-19.)

---

1 Richard Berkley is the Director of the Office of Consumer Services for the New York State Department of Public Service, which is an executive agency of the State of New York that functions as the "staff arm" of the New York State Public Service Commission. (Dkt. No. 24, at ¶¶ 1 [Berkley Decl.].)

Third, Defendants argue, the merged "balance of equities" factor and "public interest" factor both weigh against the issuance of a preliminary injunction here, because the potential pecuniary harm faced by Plaintiffs is far outweighed Defendants' interests in the conservation of public resources, the efficient administration of Government programs and public confidence therein, and the avoidance of waste and fraud in Government (i.e., the Government's ability to carry out its tasks without costly, time-consuming, or unwieldy conflict). (*Id*. at 19-21.)

**3. Plaintiffs' Reply Memorandum of Law**

Generally, in their reply, Plaintiffs assert the following three arguments. (*See generally* Dkt. No. 25 [Defs.' Reply Memo. of Law].)

First, Plaintiffs argue, they are likely to succeed on the merits for the following reasons: (a) despite Defendants' argument that utilities do not need to obtain approval of each *individual* call sent out of state but can receive *blanket* approvals upon request, the law nonetheless forbids transmitting customer service inquiries to offices outside of New York State without the Commission's prior approval; (b) the fact that the law may allow utilities to seek approval to send calls to out-of-state centers does not solve the law's Commerce Clause problem, because (i) the exercise of a constitutional right cannot be conditioned on a Government finding of a "reasonable justification" for it, (ii) the burdensome approval process (requiring a lengthy public hearing) itself unconstitutionally discriminates against interstate commerce, (iii) Defendants do not define what would qualify as a "reasonable justification" (on which to base a grant of approval) and they cannot guarantee approval in light of their stated concerns regarding emergency-call response times, (iv) the approval process does not eliminate the law's stated impermissible protectionist purpose, and (v) it is irrelevant that nobody challenged a prior version of the law (in effect since 2010) requiring utilities to seek permission before relocating

call centers out-of-state; (c) Defendants' argument that some lesser version of Commerce Clause scrutiny should apply where, as here, the relevant companies are heavily regulated by the State ignores Supreme Court precedent to the contrary; and (d) although Defendants argue that the restriction on transferring calls out of state serves valid purposes, the justifications they provide (e.g., the need to oversee consumer service activities and set rates, the need to better respond in real time to emergency calls, and the need to ensure knowledge about local conditions) are not supported by Richard Berkley's declaration, are belied by the Commission's own prior response (to a similar 2010 bill) that mandating in-state customer-assistance service does not offer any "concrete benefits for customers," and in any event can be served through a non-discriminatory alternative solution (specifically, requiring better training and education for call-center staff regardless of where they are located). (*Id*. at 6-12 [attaching pages "2" through "8" of Plfs.' Reply Memo. of Law].)

Second, Plaintiffs easily satisfy the irreparable-harm factor for the following reasons: (a) rather than dispute the well-settled point of law that an alleged constitutional violation constitutes irreparable harm, Defendants argue – without merit – that Plaintiffs are not likely to succeed on the merits; (b) in any event, Defendants are also wrong that Plaintiffs can simply pass along increased costs to their customers, because such an increase is permissible only if the Commission allows it, and, even if the Commission were to allow such a rate increase, such a fact does not somehow preclude injunctive relief against the Commission; (c) the substantial quality-of-service harms that Plaintiffs assert in their memorandum of law-in chief (requiring Plaintiffs to reprogram their phone systems to route covered calls from New York State to call centers in New York State, then hire and train new employees in New York State who may no longer be needed if Plaintiffs ultimately prevail in this action) are in no way eliminated by the

fact that utilities may seek blanket approvals instead of individual ones, especially in light of the fact that such requests may be denied, and the fact that Plaintiffs cannot obtain approval before the law takes effect on June 19 (given the mandatory 60-day delay before a hearing). (*Id*. at 12-14 [attaching pages "8" through "10" of Plfs.' Reply Memo. of Law].)

Third, Plaintiffs easily satisfy the balance-of-equities factor for the following reasons: (a) Defendants do not explain how requiring in-state customer assistance avoids "waste and fraud in government" or improves "the conservation of public resources"; (b) Defendants also do not explain how requiring burdensome hearings to decide whether utilities can continue to use out-of-state call centers furthers "efficient administration of government"; and (c) Defendants do not rebut Plaintiffs' argument about the substantial harm the public will suffer from worsened customer service and slower emergency responses, if the law were to take effect on June 19. (*Id*. at 14 [attaching page "10" of Plfs.' Reply Memo. of Law].)

## II. GOVERNING LEGAL STANDARD

### A. Legal Standard Governing a Motion for a Preliminary Injunction

"A preliminary injunction is an 'extraordinary and drastic remedy' . . . ; it is never awarded as of right . . . ." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted). Generally, in the Second Circuit, a party seeking a preliminary injunction must establish the following three elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in the party's favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is not issued; and (3) that the public interest would not be disserved by the relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord, Glossip v.*

*Gross*, 135 S. Ct. 2726, 2736-37 (2015); *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021); *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015); *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010).

With regard to the first part of the first element, a "likelihood of success" requires a demonstration of a "better than fifty percent" probability of success. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, n.2 (1987). "A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits. *See, e.g., Ligon v. City of New York,* 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing "hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities"); *Jones v. Nat'l Conference of Bar Examiners,* 801 F. Supp. 2d 270, 291 (D. Vt. 2011) (considering the harm to plaintiff and the lack of any "countervailing benefit" to defendant in balancing the equities); *Smithkline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 99-CV-9214, 1999 WL 34981557, at *4-5 (S.D.N.Y. Sept. 13, 1999) (considering the harm to defendant and the "benefit" to consumers in balancing the equities); *Arthur v. Assoc. Musicians of Greater New York*, 278 F. Supp. 400, 404 (S.D.N.Y. 1968) (characterizing "balancing the equities" as "requiring plaintiffs to show that the benefit to them if an injunction issues will outweigh the harm to other parties"); *Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 801-02 (S.D.N.Y.1967) (explaining that, in order to "balance the equities," the court "will consider the hardship to the plaintiff . . . , the benefit to [the] plaintiff . . . , and the relative hardship to which

a defendant will be subjected") [internal quotation marks omitted].[2]

With regard to the second part of the first element, "[a] sufficiently serious question as to the merits of the case to make it a fair ground for litigation" means a question that is so "substantial, difficult and doubtful" as to require "a more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953); *accord, Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205-06 (2d Cir. 1970).[3] "A balance of hardships tipping decidedly toward the party requesting a preliminary injunction" means that, as compared to the hardship suffered by other party if the preliminary injunction is granted, the hardship suffered by the moving party if the preliminary injunction is denied will be so much greater that it may be characterized as a "real hardship," such as being "driven out of business . . . before a trial could be held." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979); *Int'l Bus. Mach. v. Johnson*, 629 F. Supp.2d 321, 333-34 (S.D.N.Y. 2009); *see also Semmes Motors, Inc.,* 429 F.2d at 1205 (concluding that the balance of hardships tipped decidedly in favor of the movant where it had demonstrated that, without an injunctive order, it would have been forced out of business as a Ford distributor).[4]

---

[2] *See also Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 12, n.2 (7th Cir. 1992) ("Weighing the equities as a whole favors X, making preliminary relief appropriate, even though the undiscounted balance of harms favors Y.") [emphasis added].

[3] *See also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997); *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988); *City of Chanute v. Kansas Gas and Elec. Co.,* 754 F.2d 310, 314 (10th Cir. 1985); *R.R. Yardmasters of Am. v. Penn. R.R. Co.*, 224 F.2d 226, 229 (3d Cir. 1955).

[4] The Court notes that, under the Second Circuit's formulation of this standard, the requirement of a balance of *hardships* tipping *decidedly* in the movant's favor is added only to the second part of the first element (i.e., the existence of a sufficiently serious question as to the merits of the case to make it a fair ground for litigation), and not also to the first part of the first element (i.e., the existence of a likelihood of success on the merits), which (again) requires

With regard to the second element, "irreparable harm" is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

With regard to the third element, the "public interest" is defined as "[t]he general welfare of the public that warrants recognition and protection," and/or "[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation." *Black's Law Dictionary* at 1350 (9th ed. 2009). For example, generally, a dispute merely among private properties does not implicate the "public interest." *See, e.g., Dong v. Miller*, 16-CV-5836, 2018 WL 1445573, at *13 (E.D.N.Y. March 23, 2018) ("This case is a dispute among private parties and does not meaningfully implicate the public interest."); *Greendige v. Allstate Ins. Co.*, 02-CV-9796, 2003 WL 22871905, at *3 (S.D.N.Y. Dec. 3, 2003) ("[T]he public interest is not implicated in this case, which is a purely private litigation concerning insurance coverage in a routine tort action.").

The Second Circuit recognizes three limited exceptions to the above-stated general

---

merely a balance of *equities* (i.e., hardships and benefits) tipping in the movant's favor. *See Citigroup Global Markets, Inc.*, 598 F.3d at 36 ("Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips decidedly' in its favor . . . , its overall burden is no lighter than the one it bears under the 'likelihood of success' standard.") (internal citation omitted); *cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp.2d 186, 192 (E.D.N.Y. 2013) ("[T]he *Winter* standard . . . requires the balance of equities to tip in the movant's favor, though not necessarily 'decidedly' so, even where the movant is found likely to succeed on the merits.").

standard. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4.

First, where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous "serious questions" standard but should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Id*. (citing *Able v. United States*, 44 F.3d 128, 131 [2d Cir. 1995]); *see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) ("A plaintiff cannot rely on the 'fair-ground-for-litigation' alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme.") (internal quotation marks omitted). This is because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able,* 44 F.3d at 131.

Second, a heightened standard–requiring both a "clear or substantial" likelihood of success and a "strong" showing of irreparable harm"–is required when the requested injunction (1) would provide the movant with all the relief that is sought and (2) could not be undone by a judgment favorable to non-movant on the merits at trial. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 [2d Cir. 2006]); *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("When either condition is met, the movant must show [both] a 'clear' or 'substantial' likelihood of success on the merits . . . *and* make a 'strong showing" of irreparable harm' . . . .") (emphasis added).

Third, the above-described heightened standard may also be required when the preliminary injunction is "mandatory" in that it would "alter the status quo by commanding some positive act," as opposed to being "prohibitory" by seeking only to maintain the *status quo*.

*Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).[5] As for the point in time that serves as the *status quo*, the Second Circuit has defined this point in time as "the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68, 74, n.7 (2d Cir. 1994); *accord, Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014); *Actavis PLC*, 787 F.3d at 650.

**B. Legal Standard Governing a Claim Under the Dormant Commerce Clause**

The Commerce Clause of the U.S. Constitution vests Congress with the authority "[t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. Within that clause, the Supreme Court has interpreted the existence of a negative implication known as the "dormant" Commerce Clause, which is intended to prevent "economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988).

In the Second Circuit, "[a]nalysis of state and local laws under the dormant Commerce Clause treads a well-worn path." *N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 89 (2d Cir. 2017). "[T]he 'threshold' question we consider is whether a state or local government is 'regulating.'" *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 208 (2d Cir. 2003) (internal quotation marks omitted). "If a statute 'regulates,' then the second question we examine is whether the statute, in 'regulating,' affects interstate commerce." *Brown & Williamson Tobacco Corp.*, 320 F.3d at 208 (internal quotation marks omitted). "Finally, if a

[5] Alternatively, in such a circumstance, the "clear or substantial likelihood of success" requirement may be dispensed with if the movant shows that "extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).

state regulation 'affects' interstate commerce, we must determine whether the regulation discriminates against interstate commerce or regulates evenhandedly with incidental effects on interstate commerce." *Id* (internal quotation marks omitted); *see also Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007) ("[W]e first determine whether it clearly discriminates against interstate commerce in favor of intrastate commerce, or whether it regulates evenhandedly with only incidental effects on interstate commerce.").

In this context, discrimination means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Ore. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994); *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988). "A clearly discriminatory law may operate in three ways: (1) by discriminating against interstate commerce on its face . . . ; (2) by harboring a discriminatory purpose . . . ; or (3) by discriminating in its effect . . . ." *Town of Southold*, 477 F.3d at 47.

"We then apply the appropriate level of scrutiny." *Id*. "A law that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid per se and will survive only if it is 'demonstrably justified by a valid factor unrelated to economic protectionism.'" *Id*. (citing *Wyoming v. Oklahoma*, 502 U.S. 437 [1992]). "A law that only incidentally burdens interstate commerce is subject to the more permissive balancing test under *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 . . . (1970), and will be struck down if the burden imposed on interstate commerce clearly exceeds the putative local gains." *Town of Southold*, 477 F.3d at 47. "The party challenging a law as either clearly discriminatory or violative of *Pike* bears the threshold burden of demonstrating that it has a disparate impact on interstate commerce—the fact that it may otherwise affect commerce is not sufficient." *Id*. (internal quotation marks omitted).

"When discrimination against commerce . . . is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 353 (1977); *see also Maine v. Taylor*, 477 U.S. 131, 138 (1986) ("[O]nce a state law is shown to discriminate against interstate commerce either on its face or in practical effect, the burden falls on the State to demonstrate both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means.") (internal quotation marks omitted); *Town of Southold*, 477 F.3d at 47 ("If discrimination is established, the burden shifts to the government to show that the [legitimate] local benefits of the law outweigh its discriminatory effects and that the government lacked a nondiscriminatory alternative by which it could protect the local interests.").

When discrimination against commerce is *not* demonstrated, however, then (again, as set forth in *Pike*), the challenging party must demonstrate that the statute places a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Town of Southold*, 477 F.3d at 47 (internal quotation marks omitted).

## III. ANALYSIS

### A. Whether Plaintiffs Have Established a Likelihood of Success on the Merits of Their Claim Under the Dormant Commerce Clause

After carefully considering the matter, the Court answers the above-stated question in the affirmative for the reasons stated in Plaintiffs' memoranda of law. *See, supra,* Parts I.B.1 and I.B.3. of this Decision and Order. To those reasons, the Court adds only the following analysis (which is intended to supplement, and not supplant, Plaintiffs' reasons).

Defendants appear to concede that at issue here is a state statute that affects interstate commerce (through affecting utilities' employment of out-of-state customer-assistance representatives)[6] in a way that expressly distinguishes between "customer assistance . . . outside of New York state" and customer assistance inside of New York state, and thus not

---

[6] To the extent that Defendants argue that the statute "affects" inter-state commerce in only a "de minimis" way because of the small number of out-of-state customer-assistance representative jobs potentially affected, the Court rejects that argument. For the sake of brevity, the Court will not linger on the authority for the point of law that such a "de minimis" standard does not apply where, as here, the Court is evaluating whether a facially discriminatory statute has a discriminatory effect on interstate commerce. *See Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 38 (1st Cir. 2007) ("It strikes us as implausible that the same de minimis standard would apply when evaluating whether a facially *neutral* statute has a discriminatory effect on interstate commerce [as when evaluating whether a facially *discriminatory* statute has a discriminatory effect on interstate commerce].") (emphasis added). In any event, Plaintiff National Fuel has offered admissible record evidence of the fact that its call-center in Erie, Pennsylvania, employs approximately 100 customer-assistance representatives. (Dkt. No. 7, Attach. 3, at ¶¶ 9, 24-25 [Barnes Decl.]; *see also* Hrg. Tr. at 3, 9-10, 32.) Plaintiff Business Council has offered admissible record evidence of the fact that one of its members, Corning Natural Gas Corporation, employs a third-party vendor, Cooperative Response Center, which has call centers in "states across the country" (other than New York State) to respond to emergency calls from customers during non-business hours (and, as needed, during normal business hours). (Dkt. No. 7, Attach. 4, at ¶¶ 1-2, 5, 8; *see also* Hrg. Tr. at 12, 19, 27-28.) Finally, admissible record evidence has been adduced establishing that there are other such gas utilities in New York State. (Hrg. Tr. at 65, 67 [Hrg. Testimony of Berkley, stating that "some of the other utilities have overflow call centers in neighboring states"].) Conservatively assuming that 200 out-of-state customer-assistance representatives are currently being employed by New York State gas utilities (each employee earning an average annual salary of $25,000), the resulting amount of out-of-state wages potentially at stake (i.e., depending on Plaintiffs' compliance with the subjective standard imposed by the statute) is $500,000. This is enough. *Cf. Cmty. Currency Exch., Inc. v. N.L.R.B*., 471 F.2d 39, 41-42 (7th Cir. 1972) ("The de minimis concept, as enunciated in *NLRB v. Fainblatt*, 306 U.S. 601, 607 . . . (1939), operates to deny federal jurisdiction where a business's effect on commerce is so negligible that for jurisdictional purposes the enterprise is considered purely local. Although the concept is not susceptible to a mechanical application based upon a business volume formula, the Third Circuit has held that 'de minimis in the law has always been taken to mean trifles-matters of few dollars or less.' *NLRB v. Suburban Lumber Co*., 121 F. 2d 829, 832 (3d Cir. 1941). We adopted that reasoning in *NLRB v. Aurora City Lines, Inc*., 299 F.2d 229, 231 (7th Cir. 1962). . . . The parties stipulated that each exchange annually issues in excess of $5,000 in money orders which are cashed outside the State of Illinois. We note that that figure is significantly more than the $2,000 sum which we held not to be de minimis in *Aurora City Lines*.").

"evenhandedly" for purposes of *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 208 (2d Cir. 2003). *See, supra,* Part I.B.2. of this Decision and Order. (*See also* Hrg. Tr. at 13-23.)[7]

However, rather than argue that the statute meets the resulting strict scrutiny to which it would ordinarily be subjected, Defendants assert two arguments: (1) as an initial matter, the statute is entitled to, and survives, the *lesser* version of Commerce Clause scrutiny that applies to utility companies which are heavily regulated by the State, because such "hyper-regulat[ion]" of actual, tangible things . . . tethered to specific houses" (as opposed to "esoteric features operating in the air") inevitably conflicts with the principle of the free flow of commerce under the Commerce Clause; and (2) in any event, the statute survives strict scrutiny because the statute is not a *prohibition* on interstate commerce but merely a *process* whereby the Commission can obtain more-direct jurisdiction over (and regulate) out-of-state costumer-assistance representatives (who may harm New York State's legitimate state interests by providing inadequate customer service) by requiring such utilities to participate in a notice-and-approval process (giving notice and seeking approval based on a "reasonable justification") before they may continue to employ such representatives, which approval (a) will always be granted unless there has been an issue with whether the customer assistance provided by the representative was "adequate" (which Richard Berkley, the Director of the Office of Consumer Services, has characterized as being "good"), and (b) if not granted, will at most impose only a minimal

---

[7] As indicated above, the Court agrees with Plaintiffs that, in the alternative, New York State's customer-assistance restriction discriminates in its *purpose* against interstate commerce, because of its legislative history, and that the restriction discriminates in its *effects* against interstate commerce, because of the competitive advantage it confers upon local business as compared to out-of-state competitors.

financial burden on Plaintiffs (who would be able to pass any additional cost through to consumers). *See, supra,* Part I.B.2. of this Decision and Order. (*See also* Hrg. Tr. at 13-23, 26-30.)

With regard to the first argument, the Court has found no authority warranting the application of lesser scrutiny in cases involving utility companies that are heavily regulated by the state. *See Ark. Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 391 (1983) ("Our constitutional review of state utility regulation in related contexts has not treated it as a special province insulated from our general Commerce Clause jurisprudence."); *see, e.g., Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 492-93, 496-97 (6th Cir. 2025) (finding that there is no "public utility or energy exception to the dormant Commerce Clause," because, "far from establishing an exception to the dormant Commerce Clause, [*Gen. Motors Corp. v. Tracy*, 519 U.S. 278 (1997)] simply clarified what qualifies as discrimination in the unique regulatory setting in which that case arose"); *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 318-20, 325 (5th Cir. 2022) (finding that "[u]tilities, despite their history as monopolies and the vestiges of that tradition even in deregulated markets, are not immune from ordinary Commerce Clause jurisprudence," because *Tracy* does not "provide[] Commerce Clause immunity to any law that grants a preference to a company that has at least one foot in a captive market," and thus "[w]hat is true for alcohol and milk under the dormant Commerce Clause must be true for electricity transmission") (internal quotation marks omitted); *cf. Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 291, 295-311, & n.8 (1997) (upholding a state tax exemption for in-state gas suppliers under the dormant Commerce Clause after considering, among other things, whether the tax is facially discriminatory against similarly situated out-of-state enterprises, after recognizing that utility regulation is not "immune from [the Court's] ordinary Commerce Clause

jurisprudence").

With regard to the second argument, the Court is not convinced that the statute is not a *prohibition* but a "process" (despite the alliterative allure of defense counsel's argument). The statute expressly provides that "[n]o gas or electric corporation shall . . . send such customer assistance [set forth in paragraph (a) of this subdivision] . . . outside of New York state without notice, a hearing and approval before the commission." N.Y. Pub. Serv. Law § 65(13). Furthermore, Defendants concede that, if a utility continues to send customer assistance outside of New York State after June 19, 2025, without first having first in the notice-and-approval process, the utility will be "subject" to up to a $100,000 fine for each offense. *See* N.Y. Pub. Serv. Law § 25(2) ("Any public utility company . . . that knowingly fails or neglects to obey or comply with a provision of this chapter . . . shall forfeit to the people of the state of New York a sum not exceeding one hundred thousand dollars constituting a civil penalty for each and every offense . . ."). (Hrg. Tr. at 53, 55.)[8]

---

[8] The Court notes that it rejects defense counsel's related argument that the statute does not confer upon Defendants the authority to effectively move a call center from out of state to in state. (Hrg. Tr. at 20-29, 39-40.) The choice presented by the statute is this: (1) keep one's call center out of state but pay the fine; or (2) close one's out-of-state call center and either (a) open a call center in state or (b) do not open a call center in state (in which case one will lose customers due to the inability to serve them). Defense counsel is essentially arguing that "(2)(a)" is not a requirement because "(2)(b)" is still a choice. However, because "(2)(b)" involves the cessation of an otherwise-lawful business activity, it presents Plaintiffs with merely a Hobson's choice. *See Red Earth LLC v. U.S.*, 738 F. Supp.2d 238, 259 (W.D.N.Y. 2010) ("Hence, [cigarette retailers] will face the Hobson's choice of ceasing what they believe to be lawful business activities, or continuing to engage in those activities while facing the threat of criminal prosecution if they are wrong."), *aff'd, Red Earth LLC v. U.S.*, 657 F.3d 138, 145 (2d Cir. 2011); *Samuel M. Feinberg Testamentary Tr. v. Carter*, 664 F. Supp. 140, 143 (S.D.N.Y. 1987) ("This Court will not endorse a rule which would require directors to face a Hobson's choice of either abstaining from a transaction that requires an immediate business decision, or facing potential Section 10(b) liability for their participation in such a decision without formal shareholder approval.").

Granted, Defendants argue that there is no practical threat of such a civil penalty because the head of the New York State office that is charged with implementing the statute (Richard Berkley) assures Plaintiffs that his office would not enforce the statute against them (at least not without an underlying incident of customer assistance that was not "adequate" or "good"). (Hrg. Tr. at 26, 37, 44, 46-47, 51, 55.) However, a fatal flaw plagues that argument. For the sake of brevity, the Court will not linger on the lack of evidence that Mr. Berkley may bind the actions of any of the seven Defendants,[9] as well as the burden created by the "lengthy public hearing process" required by a N.Y. Pub. Serv. Law § 65(13),[10] and the burden created by the subjective nature of a "good" customer-assistance call or a "reasonable" justification.[11] More important is the fact that how a statute would be actually *applied* to the particular circumstances of an individual such as a plaintiff does not lighten the strict scrutiny that is ordinarily required of that statute when it uses *facially* discriminatory language.[12]

---

9 (Hrg. Tr. at 32-34, 45-47, 51-52, 55, 62-63 [Hrg. Testimony of Richard Berkley, acknowledging no such authority to bind]; *cf.* Dkt. No. 24, at ¶¶ 1, 4, 6 [Berkley Decl.].)

10 *See Assoc. Indus. Of Mo. v. Lohman*, 511 U.S. 641, 650 (1994) ("[A]ctual discrimination [under the Commerce Clause], wherever it is found, is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred."); *see, e.g., Int'l Text-Book Co. v. Pugg*, 217 U.S. 91, 108 (1910) (holding that Commerce Clause was violated where company was required merely to file a statement about its economic state "as a condition of the right . . . to do interstate business").

11 *See Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 808 (1976) ("[T]he right to engage in interstate commerce is not the gift of a state, and . . . a state cannot regulate or restrain it."), *accord, Selevan v. N.Y. Thruway Auth*., 584 F.3d 82, 90 (2d Cir. 2009).

12 *See City of Lakewood v. Plain Dealer Pub., Co*., 486 U.S. 750, 770 n.11 (1988) ("Facial attacks, by their nature, are not dependent on the facts surrounding any particular permit denial. Thus, waiting for an alleged abuse before considering a facial challenge would achieve nothing except to allow the law to exist temporarily in a limbo of uncertainty and to risk censorship of free expression during the interim."); *Field Day, LLC, v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) ("A 'facial challenge' to a statute considers only the text of the statute itself, not its

Turning to the inescapable effect of such a strict-scrutiny analysis, Defendants have offered no admissible record evidence (only argument) that the statute serves any valid state interest or local benefit (i.e., unrelated to economic protectionism). More specifically, no evidence has been offered that Defendants (or the Office of Consumer Services) have received a single costumer complaint that either regards or results from a customer-assistance representative's location out of state. (*See generally* Dkt. No. 24, at ¶ 4-7, 10, 15 [Berkley Decl., referencing the Office of Consumer Services' receipt of 45,000 phone calls annually, between 2021 and the end of 2024, from New York State consumers questioning or complaining about various aspects of the service provided to them by regulated utilities, but conspicuously failing to state that any of those calls explicitly or implicitly associated the complained-of service in any way with the representative's location outside New York State, and failing even to cite what percentages of phone calls "include[d] reports of the smell of gas, concerns about snow drifts covering gas meters, and complaints about the cost of monthly bills and impending service terminations," much less attempt to causally connect any such reports to the complained-of representative's location]; Dkt. No. 7, Attach. 4, at ¶¶ 10 [Faulk Decl., stating that "Corning has not experienced any customer complaints about the afterhours call center [staffed by out-of-state customer-assistance representatives] and continues to have a high rate of customer satisfaction."); Hrg. Tr. at 9, 18-19, 67-68 [admitting that no evidence exists of complaints being made regarding the call center's location].)

Similarly, no evidence has been offered that the number of questions and complaints that the New York State Office of Consumer Services receives annually from utility consumers

---

application to the particular circumstances of an individual.").

(again, 45,000) would decrease if the statute were to take effect on June 19, 2025. (*Id.*) For example, as indicated earlier, no evidence has been offered of what percentage of those phone calls involve complaints about issues that might conceivably result from a customer-assistance representative's location out of state: excessive customer-hold times, dropped calls, or the inability of customer-service representative to understand the local climate or terrain and/or communicate with relevant local personnel (especially in cases involving the smell of gas or the covering gas meters by snow drifts). (*Id.*) Nor has any evidence been offered that the number of such calls annually was lower *before* utilities started relying on out-of-state customer-assistance representatives – or at least before Plaintiff National Fuel started using its call center in Erie, Pennsylvania, at some point between 2000 and 2005. (*Id.*; *see also* Hrg. Tr. at 3, 5, 9, 28.)

Finally, no evidence has been offered suggesting that a need exists for a customer-assistance representative to be physically present in New York State. (*See generally* Dkt. No. 24, at ¶ 8 [Berkley Decl., stating that "[o]ne of the Office's concerns is whether utility employees communicating with consumers have a sufficiently detailed understanding of the utility's service area [including the local variations in its climate and terrain]," but conspicuously failing to state why, explain whether that concern regards both in- and out-of-state customer-assistance representatives, or even state that having employees located within a utility's service area is *necessary* to improve those employees' understanding of the service area's unique climate and terrain]; Dkt. No. 24, at ¶ 9 [Berkley Decl., stating that "having a local customer service representative present in the area [during a disruption or risk of disruption] to communicate with potentially affected consumers can shorten the utility's response time," and that "[l]ocal representatives stationed within the utility's service territory are well equipped to effectively

communicate with local emergency management services, fire fighters, law enforcement agencies, and the utility's own service technicians," but conspicuously failing to explain what a local customer-assistance representative could do during a disruption or risk of disruption that an out-of-state customer-assistance representative could not do, and what equipment a local customer-assistance representative has to effectively communicate with other local personnel that an out-of-state customer-assistance representative does not have); Hrg. Tr. at 68 [Hrg. Testimony of Richard Berkley, stating, "I think that there wasn't a great deal of belief that having all of the staff of the utilities located in the Buffalo area would have made a big difference in the great blizzard of several years ago" but then admitting, "I don't know whether that's true or not"]; Hrg. Tr. at 48-49 [Testimony of Richard Berkley, admitting that "[b]oth Buffalo and Erie sit on Lake Erie" and "the climates are similar"]; Hrg. Tr. at 21 [Hrg. Argument of Defense Counsel, conceding that "Erie's a lot closer [to Buffalo] than [is] Staten Island" but then relying only on "a historic preference for locals, so you could walk in and pay your bill" and indeed conceding that "those distinctions are narrowing quite a bit" due to advancements in telecommunications); *cf.* Hrg. Tr. at 68-69 [Hrg. Testimony of Richard Berkley, admitting that, even according to Defendants' own reasoning, a customer in Jamestown, New York, would not receive the "same benefit" as a customer in Buffalo, New York, if Plaintiff Natural Gas were to move its call center from Erie, Pennsylvania, to Buffalo, New York, because Erie is closer to Jamestown than is Buffalo].)

Perhaps most importantly, no evidence has been offered establishing that the necessary knowledge of, and familiarity with, the unique climate, terrain, geography and other attributes of customers' communities could not be identified and taught to out-of-state customer-assistance representatives through training. (*See generally* Dkt. No. 24 [Berkley Decl.]; Hrg. Tr. at 69

[Hrg. Testimony of Richard Berkley, admitting that "the commission [did not] consider any other means to achieve the purposes for this amendment"]; *cf.* Hrg. Tr. at 21 [Hrg. Argument of Defense Counsel, conceding that "[the need for local knowledge is] a historic factor but it does not in any way create a prohibition for the plaintiffs to send their service calls out of state"]; Hrg. Tr. at 10 [Hrg. Argument of Plaintiffs' Counsel, describing current customer-assistance training].)

This last fact – the apparent existence of a nondiscriminatory alternative by which New York State could protect any such local interests (in having customer-assistance representative knowledgeable about the unique geography, climate and other attributes of their customers' communities) – serves as an independent ground on which to find that the statute likely does not meet strict scrutiny. *See, supra,* Part II.B. of this Decision and Order. The Court adds only that the availability to Defendants of the New York State Department of Public Service's Customer Service Performance Indicators ("CSPI") – including the indicator that tracks the number of "escalated customer complaints" filed with the Commission[13] – appears to serve as a supplemental (if not independent) means by which Defendants may monitor and regulate the quality of the customer assistance provided by out-of-state representatives through a reasonable nondiscriminatory alternate means.

For all of these reasons, the Court finds that Plaintiffs have established a likelihood of success on the merits of their claim under the dormant Commerce Clause.

### B. Whether Plaintiffs Have Established that They Will Likely Experience Irreparable Harm if the Preliminary Injunction Is Not Issued

After carefully considering the matter, the Court answers the above-stated question in the

---

13 (Dkt. No. 7, Attach. 3, at ¶¶ 4-7 [Barnes' Decl.].)

affirmative for the reasons stated in Plaintiffs' memoranda of law. *See, supra,* Parts I.B.1 and I.B.3. of this Decision and Order. To those reasons, the Court adds only the following analysis (which, again, is intended to supplement, and not supplant, Plaintiffs' reasons).

Rather than attempt to dispute Plaintiffs' argument that that their likelihood of success on the merits of their Commerce Clause claim itself constitutes a likelihood of irreparable harm absent a preliminary injunction, Defendants argue that Plaintiffs in fact "cannot show a likelihood of success on the merits of any of their constitutional claims." (*Compare* Dkt. No. 7, Attach. 2, at 24-25 [attaching pages "19" and "20" of Defs.' Memo. of Law] *with* Dkt. No. 24, Attach. 1, at 11 [Plfs.' Opp'n Memo. of Law].) Because Defendants have not controverted Plaintiffs' underlying argument that a constitutional violation constitutes irreparable harm, they have lightened Plaintiffs' burden on that argument to one of facial merit.[14] The Court finds that that argument possesses such facial merit.[15] Furthermore, because Defendants' argument

---

[14] In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini,* 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[15] *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Conn. Dep't of Envtl. Prot. v. O.S.H.A.,* 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury.") (internal quotation marks omitted); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984) ("Given the evidence of increasing overcrowding in the state system and its potentially dangerous consequences, which constitute the alleged threat to plaintiffs' eighth amendment rights, the district judge's finding of irreparable harm is not clearly erroneous.").

regarding irreparable injury depends on a finding that Plaintiffs are in fact not likely to succeed on their merits of their claim, and because that finding is foreclosed by the Court's contrary finding in Part III.A. of this Decision and Order, the Court rejects Defendants' argument regarding irreparable injury.

In any event, the Court accepts Plaintiffs' alternative argument that, even without a showing of likelihood of success on the merits of their claim, they have showed irreparable harm in the form of having to either pay Draconian penalties (of up to $100,000 for each daily offense) or disrupt their existing customer-assistance business practices (e.g., by reprogramming their phone systems to route covered calls from New York State to call centers in New York State, then hiring and training new employees in New York State).

For all of these reasons, the Court finds that Plaintiffs have established a likelihood of irreparable harm if a preliminary injunction is not issued.

### C. Whether Plaintiffs Have Established that Both the "Balance of Equities" Factor and the Related "Public Interest" Factor Weigh in Favor of the Issuance of a Preliminary Injunction

After carefully considering the matter, the Court answers the above-stated question in the affirmative for the reasons stated in Plaintiffs' memoranda of law. *See, supra,* Parts I.B.1 and I.B.3. of this Decision and Order. To those reasons, the Court adds only two brief points (which, again, are intended to supplement, and not supplant, Plaintiffs' reasons).

First, with regard to the "balance of equities" factor, the Court finds that the hardships imposed on Plaintiffs by the statute (which include either having to pay Draconian fines or

having their business operations disrupted – possibly unnecessarily – at a substantial cost that may or may not be recouped later) decidedly outweighs any valid state interest or local benefit to Defendants (especially given the lack of evidence of a need for utility customer-assistance representative to be physically inside of New York State and, in any event, given the availability of a reasonable nondiscriminatory alternate means to preserve any such interest or benefit).

Second, with regard to the related "public interest" factor, the Court similarly finds that the public has a clear and strong interest in *not* having their emergency calls to their gas and electric utility disrupted for 21 to 23 weeks[16] during Plaintiffs' transition to all in-state representatives at a substantial cost to Plaintiffs that the public will arguably have to pay merely in order to ensure that the public's utility customer-service representatives are physically located somewhere inside New York State (and potentially farther away than the replaced out-of-state representative) when there is no proof of the need for that physical presence (and when there exists a reasonable nondiscriminatory alternate means to serve that purpose). *See Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) ("No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal.").

---

16 (Dkt. No. 7, Attach. 3, at ¶¶ 11, 17-21, 24-25 [Barnes Decl., stating, among other things, "The hiring process takes 6-8 weeks, and training additional employees, as explained above, would take approximately fifteen weeks"]; Hrg. Tr. at 10 [Hrg. Argument of Plfs.' Counsel, proffering, "The state of course has the ability to and does regulate the quality of the customer call assistance that is provided, so they get training to comply with that and they also get additional training which can take up to 15 weeks to complete, and typically does, so that they can answer any and all questions that may come up, and that has proved completely sufficient to address any kind of customer requests").

For all of these reasons, the Court finds that Plaintiffs have established that both the "balance of equities" factor and related "public interest" factor weigh in favor of the issuance of a preliminary injunction.

**D. Whether to Require Plaintiffs to Give Security**

After carefully considering the matter, the Court answers the above-stated question in the negative: Plaintiffs should be, and are, excused from giving security, because there has been no proof of any "costs and damages" that would have been sustained by any Defendant "found to have been wrongfully enjoined or restrained" under Fed. R. Civ. P. 65(c).[17]

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 7) is **GRANTED**; and it is further

**ORDERED** that Defendants are **PRELIMINARILY ENJOINED** from enforcing the amendments to N.Y. Pub. Serv. Law § 65(13) against Plaintiffs or the members of The Business Council of New York State, Inc.

---

[17] *See Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (affirming district court decision to not require a franchisor-plaintiff to post a bond for either of its injunctions because the franchisee-defendants "would not suffer damage or loss from being forced to arbitrate in lieu of prosecuting their state-court cases"); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) ("Defendants have not shown that they will likely suffer harm absent the posting of a bond by [Plaintiff]."); *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) ("[B]ecause, under Fed. R. Civ. P. 65[c], the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond."); *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961) ("[The phrase 'in such sum as the court deems proper'] indicates that the District Court is vested with wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm, or where the injunctive order was issued "to aid and preserve the court's jurisdiction over the subject matter involved.").

Dated: June 16, 2025
Syracuse, New York

Glenn T. Suddaby
U.S. District Judge